UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X **Docket#**
UNITED STATES OF AMERICA,    : 21-cr-00065(RJD-2)
                             :
                             :
   - versus -                : U.S. Courthouse
                             : Brooklyn, New York
MARTINELLI LINARES, ET AL.,  :
                             : December 11, 2021
            Defendants       :
------------------------------X

TRANSCRIPT OF CRIMINAL CAUSE FOR ARRAIGNMENT
BEFORE THE HONORABLE ROBERT M. LEVY
UNITED STATES MAGISTRATE JUDGE

**A P P E A R A N C E S:**
**(VIA VIDEO/AUDIO)**


**For the Government**:        **Breon S. Peace, Esq.**
                              United States Attorney


                      BY:    **Alixandra Smith, Esq.**
                             **Michael Harper, Esq.**
                             **Barbara Levy, Esq.**
                             Assistant U.S. Attorneys
                             271 Cadman Plaza East
                             Brooklyn, New York 11201



**For the Defendant**:         **Sean Hecker, Esq.**
                             **Justin Horton, Esq.**
                             Kaplan Hecker & Fink LLP
                             350 Fifth Avenue, Suite 7110
                             New York, NY 10118



**Transcription Service**:     **Transcriptions Plus II, Inc.**
                             61 Beatrice Avenue
                             West Islip, New York 11795
                             RL.Transcriptions2@gmail.com


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1        THE CLERK:  We're here for an arraignment in
2   *United States v. Ricardo Martinelli Linares*, Case Number
3   21-cr-65.  Would counsel state their appearances for the
4   record beginning with the government?
5        MS. SMITH:  Good afternoon, your Honor.
6   Alixandra Smith for the United States.  And with me on
7   the line are also trial attorneys Michael Harper and
8   Barbara Levy from the Department of Justice.
9        THE COURT:  Good afternoon.
10       MR. HECKER:  Good afternoon, your Honor.  Sean
11  Hecker from Kaplan, Hecker & Fink for Mr. Martinelli
12  Linares, and I'm joined by my colleague, Justin Horton.
13       THE COURT:  Good afternoon.  Good afternoon,
14  sir.  How do you like to be referred to, Mr. Martinelli
15  or Mr. Martinelli Linares?
16       THE DEFENDANT:  Hello, your Honor.  Mr.
17  Martinelli is fine.
18       THE COURT:  Okay.  All right.  So Mr.
19  Martinelli, can you hear me well?
20       THE DEFENDANT:  Yes, your Honor.
21       THE COURT:  And are you in the same room with
22  your lawyer?
23       THE DEFENDANT:  Yes, I am, your Honor.
24       THE COURT:  Are you able to speak to him and --
25       THE DEFENDANT:  Yes, I am.

3

Proceedings

1            THE COURT:  Can you do so privately if you need

2    to?

3            THE DEFENDANT:  Yes, your Honor.

4            THE COURT:  Okay.  And you can do that by

5    muting the mic if you need to.

6            All right.  So the first order of business

7    today is that we're all appearing by video.  The only

8    individuals who are in the same room are Mr. Martinelli

9    and his counsel.  The reason we're appearing by video

10   today is because we're still in the midst of a pandemic

11   and it is considered not safe for us to all appear in a

12   courtroom at this time.

13           Mr. Martinelli, you do have a right, however,

14   to appear live and in person in a court proceeding with

15   all the parties there.  And so the question I'm going to

16   ask you is whether after consulting with your lawyer you

17   are willing to waive your right to appear in person and

18   live at this time and to proceed remotely.  Let me ask

19   that question to your lawyer first.

20           MR. HECKER:  Yes.

21           THE COURT:  Have you discussed it with your

22   client?

23           MR. HECKER:  I have, your Honor, and he's

24   prepared to waive his in person appearance today.

25           THE COURT:  Mr. Martinelli, is that true?  Do

4

Proceedings

1   you waive your in person appearance today?

2              THE DEFENDANT:  Yes, your Honor.

3              THE COURT:  Are you making this decision

4   voluntarily?

5              THE DEFENDANT:  Yes, your Honor.

6              THE COURT:  Anybody force you or threatened you

7   or made you any promises to induce you to proceed

8   remotely?

9              THE DEFENDANT:  No, your Honor.

10             THE COURT:  And do you have any questions about

11  how this process works?

12             THE DEFENDANT:  No, your Honor.

13             THE COURT:  All right.  I'm going to advise you

14  that you have a right to remain silent.  Anything you say

15  here today can be used against you.  Even if you've

16  already made statements to the government, you don't have

17  to say anything else.  Because you and your lawyer are so

18  close to each other, you can consult with each other

19  privately at any point and feel free to mute the mic if

20  that's what you wish to do.  Do you have any questions?

21             THE DEFENDANT:  No, your Honor.

22             THE COURT:  All right.  You're here today

23  following an extradition from Guatemala on an indictment

24  that has criminal charges against you.  Have you had a

25  chance to either read the indictment or discuss the

5

Proceedings

1  charges with your lawyer?

2          THE DEFENDANT:  Yes, your Honor.

3          THE COURT:  Do you understand the charges?

4          THE DEFENDANT:  I do, your Honor.

5          THE COURT:  I'm going to ask the government

6  very briefly to explain or summarize the charges against

7  Mr. Martinelli.

8          MS. SMITH:  Sure, your Honor.  The defendant

9  has been charged in a five count indictment.  He's

10  charged in the first three counts with one count of

11  conspiracy to commit money laundering, and two counts of

12  substantive money laundering for his involvement in

13  facilitating laundering more than $20 million in bribes

14  from a Brazilian company called Odebrecht to a senior

15  government official in Panama who is a close relative.

16          THE COURT:  Thank you.  Mr. Hecker, would you

17  like the Court to read the indictment publically?

18          MR. HECKER:  No, your Honor.  We'll waive

19  reading.

20          THE COURT:  And how does Mr. Martinelli plead?

21          MR. HECKER:  Your Honor, Mr. Martinelli has

22  signed a plea agreement and has a change of plea

23  proceeding scheduled for before Judge Dearie on Tuesday,

24  so we'll wait until Tuesday to formally enter his plea.

25  So for purposes of today's proceeding, he'll enter a not

6

Proceedings

1   guilty plea.

2        THE COURT:  Thank you.  What's the government's

3   position on -- well, let me advise you all that I have

4   read your papers and I've read the transcript of the

5   hearing for Mr. Martinelli's brother, Luis Martinelli,

6   before Judge Henry and Judge Dearie, so I'm familiar with

7   your arguments, but I would like to hear your argument on

8   the bail issue if you wish to present it.  Shall we start

9   with the government?

10        MS. SMITH:  Sure, your Honor.  As you said, we

11   filed sort of a ten-page letter as well as the transcript

12   of the bail hearings for Luis Martinelli, Mr.

13   Martinelli's brother and co-defendant, which took place

14   before Judge Henry and Judge Dearie.  And obviously, I

15   think a lot of the facts here are the same.

16        That said, our position is that the defendant

17   is a risk of flight and there are not conditions

18   sufficient to ensure his return to court for the duration

19   of this case.  And in any event, that the package that's

20   presented is certainly insufficient.

21        So as set forth in our papers, the defendant is

22   a risk of flight given the nature and seriousness of the

23   crimes which I have just described.  And we've identified

24   sort of more information for you on the senior government

25   official involved in a sealed filing that was provided to

7

Proceedings

1  you which the defense also has.  And obviously, the

2  weight of the evidence which I think is made clear by the

3  fact that the defendant fled in June of 2020 sort of

4  knowing what the evidence was and being engaged in plea

5  negotiations and the fact that he's agreed to plea on

6  Tuesday.  So that factor obviously weighs in favor of

7  detention.

8          We've described in some detail the flight from

9  the United States in June 2020.  There were not charges

10  pending at that time but the parties were engaged in plea

11  negotiations and were exchanging papers and very close to

12  sort of finalizing a plea.  And as we set forth our

13  papers, the defendant and his brother left the United

14  States without informing the government, used a private

15  jet to evade U.S. border patrols, and then sort of

16  hopscotched around Central America in an attempt to get

17  back to Panama which was locked down because of the COVID

18  19 crisis.

19          He used invalid diplomatic credentials to cross

20  the border into Guatemala which said he was a member of

21  the Central American Parliament and he was not.  And then

22  he and his brother got a waiver from the Panama Ministry

23  of Health to get back into Panama when the country was

24  locked down and was arrested on a private jet in

25  Guatemala that was destined back for Panama.

8

Proceedings

1    So he obviously went to great lengths to flee

2  the United States at that time.  And he did so even

3  though there were charges pending in the criminal case in

4  Panama.  And so he made the decision at that time that he

5  would fare better there which is sort of the same

6  circumstances that were here.  And once he was in

7  Guatemala and had been arrested, he fought extradition.

8  He did so until the point at which his brother, you know,

9  his appeals were exhausted and was going to be

10  extradited.  And at that point only agreed to waive his

11  remaining challenges and be extradited to the United

12  States.

13    So obviously, that flight, which I think Judge

14  Dearie in particular found very persuasive and I think

15  shows that the defendant has the means and also the

16  incentive to flea because like I said, the charges that

17  are described in his papers were pending in Panama in

18  June of 2020 just as they are today.

19    He obviously has extensive political

20  connections in Panama, extensive family wealth.  In

21  addition to the I believe 3.2 million in cash and 4.2

22  million in real estate that's detailed in the Pretrial

23  Services report, he obviously has access to extensive

24  family wealth.  He has citizenship in both Panama and

25  Italy.  And obviously that Panama does not extradite its

9

Proceedings

1  own citizens is another fact.

2         And then in addition to everything else, the

3  package that's been presented is insufficient, so we

4  don't believe that there's any package that would be

5  sufficient, but this one in particular is definitely not.

6  It represents a tiny fraction of his person wealth.  Not

7  just what was again disclosed in the Pretrial Services

8  report but also what he has access to through his family.

9  It is dwarfed by the almost $19 million in forfeiture

10  obligations that he will be on the hook for once he

11  pleads on Tuesday.  And we have no information on the

12  suretors.  They're described only as close friends.  We

13  have no idea sort of who they are, what moral suasion

14  they might have over the defendant, what their wealth is

15  such that the percentage of what they might be willing to

16  put up for the bond, sort of what that impact would be on

17  those suretors.  And I note that Pretrial Services was

18  not able to contact any of them this morning.  And I also

19  just note that it is a smaller package than was presented

20  by his brother before Judge Dearie and was rejected.

21         And then the final point that I'll make which

22  we made in our papers was that Mr. Martinelli is going to

23  plead guilty on Tuesday as scheduled.  The presumption

24  then flips for him to show that he is not a risk of

25  flight from the presumption that we're dealing with now.

10

Proceedings

1  So that's even a higher burden if he does in fact plead

2  on Tuesday.

3          THE COURT:  Thank you.  Mr. Hecker?

4          MR. HECKER:  Yes, your Honor.  Thank you.

5          We're prepared to treat this as if he has

6  already pled guilty because he signed a plea agreement

7  last week after much back and forth with the government

8  and he did so because he made a decision.  He made a

9  decision some time ago to voluntarily return to this

10  country, resolve these charges, attempt to do so in a way

11  that would result in protection from subsequent

12  prosecution for the same underlying conduct in Panama

13  which is the reason that the parties have negotiated a

14  proper statement of facts which is not, you know, typical

15  in this district.

16          And he did all of those things because he

17  obviously at this juncture has every intention of

18  resolving this case, pleading guilty on Tuesday, and

19  going before Judge Dearie and asking for a sentence of

20  time served.  The reason he's asking for a sentence of

21  time served is because it's an incredibly reasonable

22  sentence under all of the facts and circumstances of this

23  case.  Mr. Martinelli Linares has been in Guatemala in

24  prison for over 17 months.  He and his brother are

25  accused of being effectively middlemen in a corruption

Proceedings

1   scheme involving the Odebrecht scandal which Ms. Smith
2   made reference to.
3          The only other defendant has been successfully
4   prosecuted in the United States was the CEO of Braskem.
5   In that case, the government agreed to recommend a
6   sentence of no more than 60 months imprisonment before
7   Judge Dearie.  Judge Dearie gave Mr. Grubisich 20 months
8   in prison.  He will not serve more than the 17 months
9   that Mr. Martinelli and his brother have already served.
10         And under the circumstances, there is no
11  logical reason in the world for Mr. Martinelli to plead
12  guilty and then go back to Panama.  It would disrupt the
13  entire justification for the proceeding that we're moving
14  forward with on Tuesday and for sentencing.
15         To the extent that the bail package that we've
16  offered in the government's view, or in the Court's view
17  more importantly, is insufficient, we're prepared to
18  bolster it.  We in fact provided Pretrial Services with
19  the names of seven friends.  We gave cell numbers.  We
20  identified all of these people.  And I think the Pretrial
21  Services officer will confirm that it wasn't a function
22  of her not being able to contact these people because
23  they didn't pick up or something, it's because she didn't
24  have time this morning to do it.  But these are all
25  people who know our client well from school when he

12

Proceedings

1   attended Georgetown University from his subsequent time

2   in San Francisco.  These are close friends, people

3   willing to post property if need be.  We had in our

4   letter made a proposal of a package, a four and a half

5   million dollar personal recognizance bond secured by $1

6   million of his own funds, plus security from these other

7   suretors.  We're prepared to increase that to the extent

8   that it's the sufficiency of the package we're talking

9   about.

10          But I have to say the logic of where we are

11  makes very clear that he is not a flight risk.  It would

12  be a completely irrational decision to take.  He doesn't

13  have his travel documents.  Counsel's in possession of

14  his Panamanian passport.  His Italian passport, which he

15  has by reason of his birth, is already in ICE custody as

16  far as I understand it.  And there is no reason for him

17  to flee.  So we view this as a very simple argument.  The

18  circumstances are actually different from those that were

19  before Judge Dearie when the government suggested that

20  maybe it wasn't clear whether the plea would go forward.

21          Mr. Martinelli's brother has already pled

22  guilty.  He's going to be -- he himself is going to plead

23  guilty on Tuesday and there is literally no reason for

24  him to flee.

25          If I might just make a couple of other brief

13

Proceedings

1   points which were referenced in our letter but I think

2   important, if he's detained pending sentencing, he'll be

3   staying at the MDC.  He's had two vaccination shots and a

4   booster shot.  Notwithstanding that, and notwithstanding

5   our providing all of that information to legal at the

6   MDC, we're told he must be quarantined.  It appears he's

7   going to be quarantined in a small cell with another

8   recent arrestee.  His brother spent 18 days in

9   quarantine.  Quarantine means being in your cell for all

10  but 30 minutes a day every other day.  You get 30 minutes

11  out of your cell.  It is frankly inhumane to be treated

12  that way.

13        My client doesn't need to be treated that way

14  but yet MDC is insisting on a quarantine status which is

15  supposed to be 14.  As I said, his brother had 18 days.

16  And we think that's another reason for granting bail in a

17  case like this.  It would be unduly punitive,

18  unnecessarily punitive to hold him at the MDC pending

19  sentencing in this case.

20        THE COURT:  All right.  Thank you.  Is there

21  anything else the government would like to say?

22        MS. SMITH:  Yes, your Honor, just to very

23  briefly respond.  With respect to Mr. Grubisich, who's

24  the other Odebrecht defendant that Mr. Hecker referred

25  to, his sentence was actually capped at ten years because

Proceedings

1   he pled to very different charges.  He did not plead to

2   money laundering charges.  He didn't flee the country in

3   connection with his case.  And he actually had a

4   significant bail package that he was released on at $30

5   million and a number of suretors including family

6   members.  And I do think that the sentencing factors are

7   going to weigh differently for these defendants than for

8   Mr. Grubisich.

9           In terms of the argument that it would be

10  irrational to flee at this point, I do point out this is

11  the exact point that we were at in June 2020 when the

12  defendant chose to leave the country.  And as we set

13  forth in our filing, I think there's a real question

14  about this idea of wrapping up the charges here and in

15  Panama that the charges there may not carry the same kind

16  of serious sentence and that given the nature of the

17  political connections, that the consequences there may

18  not be as serious here and that is a reason to flee.

19          In terms of the travel documents, obviously

20  we've seen that the defendant can access diplomatic

21  credentials that were invalid and sort of otherwise

22  access ways to get into the country that are not the

23  standard approach for most Panamanian citizens.  The

24  waiver that they got in June 2020 was one that was not

25  available to everyday citizens.  So I think the idea that

15

Proceedings

1   certain of his travel documents are in the possession of

2   ICE or Pretrial is not sufficient here.

3         And finally on the MDC point, I just want to

4   put on the record that there is a mandatory 14-day

5   quarantine period.  The defendant's not treated any

6   differently than anybody else.  And for his brother, at

7   the end of the 14-day period there's another test that's

8   conducted, a PCR test, to determine whether or not the

9   defendant is still -- does not have COVID, and that did

10  take a number of days to come back which explains the 18

11  days.  And I think per BOP regs it actually says 14 to 21

12  days.  So it's obviously unfortunate but it is because of

13  the pandemic and those procedures were sort of followed

14  the same way with all defendants at the MDC.

15         MR. HECKER:  Your Honor, if I may just briefly?

16         THE COURT:  Yes.

17         MR. HECKER:  I mean the entirety of the

18  government's argument rests on this claim that it's the

19  exact same situation that existed when they left the

20  United States in June of 2020, and that's just obviously

21  not accurate.  There were no pending charges.  There were

22  plea discussions, but there were no pending charges.

23  There was no court order that they remain in the country.

24  I understand that the government's upset about the prior

25  set of circumstances.  It was unfortunate.  It was

16

Proceedings

1   obviously a mistake.  Our client spent 17 months in

2   Guatemalan prison in the interim.  His brother has

3   already pled guilty and he's pleading guilty on Tuesday.

4   I mean the notion that it's the same circumstances, I

5   mean it doesn't require a whole lot of thinking through

6   that logic to understand why it's simply wrong.

7           And it is true that the government agreed in

8   Mr. Grubisich's case to allow a plea to two counts, each

9   of which had a maximum of five years, and they

10  recommended five years and Judge Dearie gave two, but the

11  underlying conduct is he was the CEO of a company who

12  paid hundreds of millions of dollars in bribes.  And the

13  government hasn't suggested and couldn't possibly suggest

14  that Mr. Martinelli is more culpable than Mr. Grubisich.

15          So we feel quite strongly about our position.

16  Obviously that's going to be a decision for the judge to

17  make after getting a pre-sentence report.  But that's the

18  mind set of our client as he made the decision over a

19  month ago to give up his extradition fight and to come

20  here voluntarily to resolve this matter.  So it's just

21  not true that it's the same circumstance that existed

22  previously.

23          THE COURT:  All right.  Thank you both.

24          I've spent a lot of time thinking about this

25  case and I've read, as I said, I've read the transcripts

17

Proceedings

1   of the hearings, et cetera.  Under 3142(g), looking at
2   the factors that the Court has to consider, I don't think
3   there's a lot of disagreement about most of them.  The
4   nature of the offense, I think we all understand what the
5   offense was and it has serious ramifications.  The weight
6   of the evidence, I think the weight of the evidence is
7   great whether you make that conclusion because the
8   defendant has chosen to plead guilty or because of the
9   properties that have been made.  I just don't think
10  there's much dispute there.  The history and
11  characteristics of the defendant, again, I don't think
12  there's a lot in dispute about that.  And the real
13  question is whether or not there are conditions or a
14  combination of conditions under which he could be
15  released that would assure his appearance in court or
16  protect the community.
17          I don't see this as a danger to the community
18  case.  I think we're just talking about risk of flight.
19  And I think my decision isn't going to be made in a
20  vacuum.  It's being made in context of what's happened
21  over the last couple of years and particularly in the
22  context of Mr. Martinelli's brother's hearing before
23  Judge Dearie, what Judge Dearie said and what Judge Henry
24  had concluded.
25          So we'll start that Mr. Martinelli is not a

18

Proceedings

1   U.S. citizen.  He's a citizen of Panama and Italy.  He
2   doesn't have any deep roots in this district.  His family
3   resides primarily in Panama, a country that does not
4   provide for extradition of its citizens.  He does have
5   access to substantial financial resources.  He is
6   politically connected at very high levels of power in
7   Panama.  And he has used his influence and his resources
8   allegedly through bribes to influence others and also in
9   his escape, or at least his leaving the country a couple
10  of years ago in obtaining bogus identification cards and
11  an emergency humanitarian authorization to enter Panama.
12  So we know that his connections are not just theoretical
13  as to what they can do, but they could produce a result,
14  they could be deployed.
15           He left the United States before a plea was
16  finalized.  He did so in a way that as we see in other
17  cases would be described as trying to evade detection.
18  He took a boat to the Bahamas.  He took a private jet
19  that was headed for Panama where there is not an
20  extradition possibility.  It was through the vagaries and
21  the bad luck of COVID that the plane was turned away and
22  he had to go to Costa Rica, El Salvador, and ultimately
23  Guatemala.  He attempted to use a private family jet to
24  get him out of Guatemala to fly to Panama again using
25  diplomatic credentials that were not valid.  And he spent

Proceedings

1  a lot of time in Guatemala where he fought extradition

2  for a period of time and only after his brother's

3  extradition essentially was granted did he decide to give

4  up the battle.  There are a lot of reasons to say that he

5  chose to leave under circumstances that one might call

6  flight.

7            You know, judges have to make decisions in a

8  vacuum sometimes and often we're asked to have crystal

9  balls to decide whether a defendant is going to be

10  dangerous or going to flee.  We never know.  We can't

11  predict the future with all accuracy.  But what we can do

12  is we can look at past events and what happened.  The

13  strongest argument for the government is look at what

14  happened when he left the country and the way he did it

15  and the way he used his credentials and influence.  And

16  the defense's argument is well things have changed now.

17            I think Judge Dearie made clear how he views

18  the circumstances and I think ultimately he's right.  He

19  said in the old dictum fool me once shame on you, fool me

20  twice shame on me.  And I think where I ultimately come

21  down here.  And I think that there is a difference

22  between asking for release on bail today before the

23  guilty plea and asking for release after the guilty plea.

24  And that I think is where your strongest argument may

25  come after the plea of guilty has actually taken place,

20

Proceedings

1    something which was scheduled to happen, or not scheduled

2    to happen but anticipated, before, Mr. Martinelli, you

3    left the country.

4             So I do find that based on the facts of what

5    you have done in the past that you are a risk of flight

6    and all the factors I just discussed.  And I think it'll

7    be up to you and your lawyer to convince Judge Dearie

8    after the guilty plea on Tuesday that the circumstances

9    have indeed changed and that you can be trusted at that

10   point.

11            So my decision is that you are a risk of flight

12   at this point, but I'm not making any prediction or

13   statement as to whether or not you would continue to be a

14   risk of flight after you plead guilty.  So that's my

15   ruling.

16            And with respect to the MDC, I'm sorry to have

17   to put anyone in the MDC.  I've had enough experience

18   with the MDC, and I think the government has as well, to

19   know that it's not where we would like to send anyone.

20   But unfortunately, the COVID restrictions do have to

21   apply.  There's a reason for them.  And even if the Court

22   disagreed, the Court doesn't have any power to affect

23   those quarantines.  So that's the Court's ruling at this

24   time.

25            I'm going to read an order.  Under Federal Rule

Proceedings

1    of Criminal Procedure 5(f) I direct the prosecution to

2    comply with its obligation under *Brady v. Maryland* and

3    its progeny to disclose to the defense all information

4    whether admissible or not that is favorable to the

5    defendant material either to guilt or to punishment and

6    known to the prosecution.  Possible consequences for

7    noncompliance may include dismissal of individual charges

8    or the entire case, exclusion of evidence, and

9    professional discipline or court sanctions on the

10   attorneys responsible.

11          I will be entering a written order more fully

12   describing this obligation and the possible consequences

13   a failing to meet it, and I direct the prosecution to

14   review and comply with that order.  Even though a guilty

15   plea is scheduled for Tuesday, Brady certainly still

16   applies.

17          Ms. Smith, does the prosecution confirm that it

18   understands its obligations and will fulfill them even at

19   this late stage of the proceedings?

20          MS. SMITH:  Yes, your Honor.

21          THE COURT:  Okay.  Thank you.  Is there

22   anything else from the government?

23          MS. SMITH:  No, your Honor.

24          THE COURT:  From the defense?

25          MR. HECKER:  No, your Honor.

22

Proceedings

1          THE COURT:  All right.  And good luck, Mr.

2    Martinelli.  And my decision shouldn't cast any doubt as

3    to the quality of representation you received from Mr.

4    Hecker.  He did an excellent job.

5          THE DEFENDANT:  Thank you, your Honor.

6          THE COURT:  Thank you.

7                    (Matter concluded)

8                         -oOo-

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

23

# C E R T I F I C A T E

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **13th** day of **December**, 2021.

*Mary Greco*

Transcriptions Plus II, Inc.