# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE | 63RD FLOOR
NEW YORK, NEW YORK 10118
TEL (212) 763-0883 | FAX (212) 564-0883
WWW.KAPLANHECKER.COM

DIRECT DIAL   212.763.0889
DIRECT EMAIL  shecker@kaplanhecker.com

December 13, 2021

**BY ECF AND EMAIL**

The Honorable Raymond J. Dearie
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

RE:   **United States v. Ricardo Alberto Martinelli Linares, 21 Cr. 65 (RJD)**

Dear Judge Dearie:

We represent Ricardo Alberto Martinelli Linares, who will be appearing before Your Honor tomorrow, December 14, to plead guilty to one count of money laundering conspiracy. *See* Ex. A (executed final plea agreement).  Magistrate Judge Levy remanded Mr. Martinelli to the MDC after his presentment last Saturday, December 11, while noting that Your Honor had ordered Mr. Martinelli's brother and co-defendant, Luis, detained *before* he pleaded guilty.  *See* Dec. 12 Tr. at 19:21-23 ("And I think that there is a difference between asking for release on bail today before the guilty plea and asking for release after the guilty plea."); Minute Entry, Nov. 23, 2020 (entering detention order more than a week before Luis Martinelli's guilty plea).

Under tomorrow's different circumstances—where Ricardo Martinelli will have pled guilty and asked the Court to expedite sentencing so that he can argue for time served—he will be manifestly "not likely to flee."  18 U.S.C. § 3143(a)(1).  We therefore ask the Court to order Mr. Martinelli's conditional release, including to avoid the prospect of pre-trial detention under extraordinarily difficult circumstances at MDC (which has begun with at least a two-week quarantine) and to enable Mr. Martinelli and his counsel to adequately prepare for sentencing.

**Legal Standard**

The Bail Reform Act requires the release of a convicted defendant who is "not likely to flee."  *See* 18 U.S.C. § 3143(a)(1).

Following conviction, the burden of proof on Mr. Martinelli's flight risk shifts from the government to the defense.  While Mr. Martinelli forfeits his pre-conviction presumption of release, the Court *must* release him upon a clear and convincing showing that he is "not likely to

KAPLAN HECKER & FINK LLP

flee." *See United States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004) ("[I]f a defendant can make the required evidentiary showing, the [post-conviction] statute establishes a right to liberty that is not simply discretionary but mandatory: the judge *shall* order the release of the person in accordance with section 3142(b) or (c)." As *Abuhamra*'s reference makes clear, the post-conviction release statute incorporates the pre-conviction statute's requirement that the Court release Mr. Martinelli if any "condition, or combination of conditions . . . will reasonably assure [his] appearance as required." 18 U.S.C. § 3142(c).

### **Ricardo Martinelli is Manifestly "Not Likely to Flee" Before Seeking Time Served**

On November 23, Your Honor remanded Mr. Martinelli's brother and co-defendant, Luis, on the ground that Luis's "[incentive] to flee is even greater now" than it was in June 2020, when both brothers left the United States before any criminal charges had been filed against them. *See* Nov. 23 Tr. at 28:22-24. Your Honor also noted that "the question of bail remains open at all times." *Id.* at 29:8-11.

We respectfully ask the Court to reconsider its calculation of the Martinelli brothers' incentives and intentions to flee. Their circumstances at tomorrow's hearing are entirely different from the context of their June 2020 departure, when the nature of any possible charges was uncertain and both brothers were facing potentially unbounded detention in an ICE or BOP facility at the height of the COVID-19 pandemic.

At tomorrow's hearing, by contrast, Ricardo Martinelli will be pleading guilty to a single count of money laundering conspiracy after serving more than seventeen months in a Guatemalan prison. He has therefore already served more time than Jose Grubisich is expected to serve after good-time credits are applied to Your Honor's 20-month sentence for one of the senior leaders of the bribery scheme in which Mr. Martinelli played a peripheral role as a middleman for a family member. All of Mr. Martinelli's incentives point clearly in the direction of appearing again before Your Honor to seek a sentence of time served.

No matter the length of Your Honor's ultimate sentence, Mr. Martinelli has so much to gain from a final resolution of his U.S. charges and everything to lose from flight that would scuttle his guilty plea. For one thing, an accepted plea and imposed sentence in the United States will best allow Mr. Martinelli to seek a concurrent resolution of his pending Panamanian charges. For another thing, it would simply make no sense for the 42-year-old Mr. Martinelli—a graduate of Georgetown University with abundant social and professional connections in the United States—to choose a long life of fugitivity and isolation over accepting Your Honor's sentence after seventeen months of prior detention and thereby permanently resolving his U.S. criminal liability. *Cf. United States v. Nicolo*, 706 F. Supp. 2d 330, 333 (W.D.N.Y. 2010) (court considers whether "a defendant may feel that he has little or nothing to lose by fleeing").

We are unable to identify any case in which a defendant was remanded before sentencing after they had very likely served the bulk of their ultimate sentence in pretrial detention. That is not surprising: defendants in this circumstance have the opposite of the usual post-conviction

KAPLAN HECKER & FINK LLP

defendant's incentive to avoid a long future in prison, and will lose more than they could possibly gain by fleeing. Instead, the pre-sentencing detention cases invariably highlight a defendant's certainty of long-term incarceration or other characteristics (like advanced age) that make the Hail Mary of evading restrictive release conditions worth the undeniably long odds of success. *See, e.g.*, *United States v. Madoff*, 316 F. App'x 58, 59 (2d Cir. 2009) (summary order) (affirming Bernie Madoff's pre-sentencing detention order that was premised exclusively "on his age and exposure to a lengthy imprisonment); *United States v. Watson*, -- F. Supp. 3d --, 2020 WL 2315415 at *3 (E.D.N.Y. May 6, 2020) (defendant facing a life sentence "has every incentive to flee"). Indeed, the Second Circuit has recently suggested that not every sentence provides an incentive to flee—only those that are "significant enough." *United States v. Scali*, 738 F. App'x 32, 33 (2d Cir. 2018) (summary order) (affirming pre-sentence detention on ground that receiving a within-Guidelines sentence of 87-108 months is "significant enough to provide an incentive to flee" where such "potential sentence could well take up most of the rest of his life").

Nor is there any remaining process standing between Mr. Martinelli's acceptance of responsibility and the Court's sentencing. At Luis Martinelli's November 23 bail hearing, Your Honor stated that, "[H]is intent to flee is even greater now.[1] Time's up. He either cooperates or doesn't." Nov. 23 Tr. at 28:22-24. For the avoidance of any doubt, we note that neither Ricardo nor Luis Martinelli have cooperation agreements—the executed plea agreement attached to this letter as Exhibit A describes Mr. Martinelli's sole obligations to the United States government. And progress has already been made on these obligations, which are limited to liquidating certain assets and/or causing them to be transferred to the United States government. Mr. Martinelli therefore does not seek release prior to his initiation of an obligation to provide lengthy and trying assistance as a cooperating witness, a context in which the flight-risk calculus would indeed be different.

By contrast, a conditional release order would *reduce* Mr. Martinelli's incentives to flee by allowing him to use the time in between to impress upon Your Honor his qualification for a sentence of time served. *See United States v. Suazo Nunez*, No. 20-mj-1734, 2020 WL 1911226, at *3 (S.D.N.Y. Apr. 20, 2020) ("[C]ompliance with terms of release . . . would inure to [the defendant's] benefit at time of sentencing" and therefore "offer strong incentive not to flee and further mitigate risk of flight."); *cf. United States v. Villines*, 32 F.3d 569 (Table), 1994 WL 378243, at *3 (6th Cir. 1994) ("[A] defendant who knows to a certainty that he will be spending time in prison has a greater incentive to flee than a defendant who, prior to conviction or sentencing, may be pinning his hopes on acquittal or leniency.").

---

[1] Given that Luis Martinelli has no *intention* to flee, and that the government did not allege or proffer any evidence of any such intent, we believe there is a transcription error in the November 23 transcript and that Your Honor instead referred to Mr. Martinelli's theoretical "*incentive*" to flee.

KAPLAN HECKER & FINK LLP

### Release Conditions Would "Reasonably Assure" Mr. Martinelli's Appearance at Sentencing

Mr. Martinelli's strong incentives to finally resolve this case are not the only reason he is certain to appear for sentencing. The Court can also order conditions that would extinguish any doubts about Mr. Martinelli's inclination or ability to flee.

Mr. Martinelli previously proposed a $4.5 million bond, secured by $1 million in his own cash and pledges of personal residential equity by seven close friends in New York and other locations in the United States. Given the government's position that this package was insufficient, he is proposing to increase the proposed bail package to a $5 million bond, secured by $2.5 million in cash, as well as additional property, as needed, from among his proposed sureties in the United States. Counsel has also arranged for an apartment in Manhattan in which Mr. Martinelli could remain under stringent conditions of GPS-monitored home detention. This package, in conjunction with Mr. Martinelli's strong interest in receiving a final sentence, will more than "reasonably assure" his single remaining appearance—though we will be prepared at tomorrow's hearing to discuss alternative conditions at the Court's request.

### Detention at the MDC Is Unnecessary in View of Mr. Martinelli's Incentives to Appear and the Possibility of Conditional Release

In view of Mr. Martinelli's incentives and the potential for strict release conditions, there is no just reason to keep him detained amidst the notoriously poor conditions at the MDC.

Despite being fully vaccinated with a recent booster shot, Mr. Martinelli is currently facing a minimum fourteen-day quarantine in which he will be confined to his cell for all but thirty minutes a day. His brother Luis's purportedly fourteen-day quarantine stretched to eighteen days because, the government claims, it can take the MDC four days to obtain the results of a COVID test. *See* Dec. 11 Tr. at 15:3-14 (acknowledging that, while this is "obviously unfortunate," "those procedures were sort of followed the same way with all defendants at the MDC"). When Mr. Martinelli is finally released into the general population, he will be in crammed conditions and exposed daily to the nearly one in three MDC staff who remain unvaccinated even as the omicron variant appears to be generating a spike in ordinary and breakthrough COVID cases.[2]

Aside from these unsafe and inhumane conditions, detention at the MDC will seriously impair Mr. Martinelli's ability to prepare with his counsel for sentencing. Counsel just confirmed today that, starting December 20, the MDC will no longer schedule in-person visits,

---

[2] *See* NBC New York, *NYC Covid Case Average Soars as Omicron Count Rises; State Hospitalizations Up 86% in Month*, Dec. 8, 2021, available at https://www.nbcnewyork.com/news/coronavirus/nyc-covid-case-average-soars-as-omicron-count-rises-state-hospitalizations-up-86-in-month/3440777/; BOP, COVID-19 Vaccination Implementation, bop.gov/coronavirus (showing, as of December 9, that 306 staff were vaccinated at MDC); Office of Inspector General, Pandemic Response Report 21-002, Remote Inspection of Metropolitan Detention Center Brooklyn at iii (Nov. 2020), https://oig.justice.gov/sites/default/files/reports/21-002.pdf (showing that the MDC has approximately 460 staff).

KAPLAN HECKER & FINK LLP

requiring counsel to travel to Sunset Park and hope (against past experience) that a walk-in visit is made reasonably available.

### Conclusion

Ricardo Martinelli has traveled to the United States to enter a guilty plea after spending more than seventeen months in detention at a Guatemalan prison.  By accepting responsibility in a United States court for conduct that also underlies pending criminal charges in Panama, Mr. Martinelli reasonably aims to effect a resolution of both pending cases.  He will allocute in this Court to serving as an intermediary for bribes paid by Odebrecht and related entities to his family member, and thereby participating in a money laundering conspiracy in violation of U.S. law. Shortly thereafter, his counsel will present arguments for an appropriate sentence that reflects the seriousness of his offense while avoiding unwarranted disparities with defendants found guilty of similar conduct.  There is no coherent theory by which Mr. Martinelli stands to gain more than he clearly will lose should he flee between accepting responsibility and receiving his sentence. In view of the government's steadfast commitment to keeping Mr. Martinelli in jail, we seek the Court's consideration of our proposed bail package in advance of Mr. Martinelli's forthcoming plea hearing.

Respectfully submitted,

Sean Hecker
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118

*Counsel for Ricardo Alberto Martinelli Linares*

# EXHIBIT A

AES:JN
F. # 2020R00016

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA

    - against -

RICARDO ALBERTO MARTINELLI
LINARES,

      Defendant.

– – – – – – – – – – – – – – – – – X

     PLEA AGREEMENT


     21 CR 65 (RJD)

     Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the United States

Attorney's Office for the Eastern District of New York, the United States Department of Justice,

Criminal Division, Fraud Section, and the United States Department of Justice, Criminal

Division, Money Laundering and Asset Recovery Section (collectively, the "Government"), and

RICARDO ALBERTO MARTINELLI LINARES (the "defendant") agree to the following:

    1.  The defendant will plead guilty to Count One of the above-captioned

Indictment, charging a violation of 18 U.S.C. § 1956(h).  The count carries the following

statutory penalties:

    a.  Maximum term of imprisonment: 20 years
      (18 U.S.C. §§ 1956(a) and 1956(h)).

    b.  Minimum term of imprisonment: 0 years
      (18 U.S.C. §§ 1956(a) and 1956(h)).

    c.  Maximum supervised release term: 3 years, to follow any term of
      imprisonment; if a condition of release is violated, the defendant
      may be sentenced to up to 2 years without credit for pre-release
      imprisonment or time previously served on post-release
      supervision
      (18 U.S.C. §§ 3583 (b) & (e)).

     d.    Maximum fine:  $500,000 or twice the gross gain or loss, whichever is greater
(18 U.S.C. §§ 1956(a), 1956(h), 3571(b)(1), 3571(d)).

     e.    Restitution:  Mandatory in the full amount as determined by the Court
(18 U.S.C. §§ 3663A and 3664).

     f.    $100 special assessment
(18 U.S.C. § 3013).

     g.    Other penalties: removal, as set forth in paragraph 14; criminal forfeiture, as set forth in paragraphs 7 through 13
(18 U.S.C. §§ 982(a)(l) and 982(b)(1)).

2.    The defendant understands that although imposition of a sentence in accordance with the United States Sentencing Guidelines (the "Guidelines" and "U.S.S.G.") is not mandatory, the Guidelines are advisory and the Court is required to consider any applicable Guidelines provisions as well as other factors enumerated in 18 U.S.C. § 3553(a) to arrive at an appropriate sentence in this case.  The Government will advise the Court and the Probation Department of information relevant to sentencing, including criminal activity engaged in by the defendant, and such information may be used by the Court in determining the defendant's sentence.  See 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").  The Government estimates the likely adjusted offense level under the Guidelines to be a range of imprisonment of 151 to 188 months, which is predicated on the following Guidelines calculation:

| | | |
|---|---|---|
| Base Offense Level (§ 2S1.1(a)(2)) | | 8 |
| Plus: | Loss More than $25,000,000 (§ 2B1.1(b)(1)(L)) | +22 |
| Plus: | Conviction under 18 U.S.C. § 1956(h) (§ 2S1.1(b)(2)(B)) | +2 |
| Plus: | Offense Involved Sophisticated Laundering (§ 2S1.1(b)(3)) | +2 |

Total:                                                                                    <u>34</u>

If the defendant clearly demonstrates acceptance of responsibility, through allocution and

subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted,

pursuant to U.S.S.G. § 3E1.1(a), resulting in an adjusted offense level of 32 and a range of

imprisonment of 121 to 151 months, assuming that the defendant falls within Criminal History

Category I.  Furthermore, if the defendant has accepted responsibility as described above, to the

satisfaction of the Government, and if the defendant pleads guilty on or before December 15,

2021, an additional one-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(b),

resulting in an adjusted offense level of 31.  This level carries a range of imprisonment of 108 to

135 months, assuming that the defendant falls within Criminal History Category I.  The

defendant stipulates to the above Guidelines calculation.

       3.     The Guidelines estimate set forth in paragraph 2 is not binding on the

Government, the Probation Department or the Court.  If the Guidelines offense level advocated

by the Government, or determined by the Probation Department or the Court, is, for any reason,

including an error in the estimate, different from the estimate, the defendant will not be entitled

to withdraw the plea and the Government will not be deemed to have breached this agreement.

       4.     The defendant agrees not to file an appeal or otherwise challenge, by

petition pursuant to 28 U.S.C. § 2255 or any other provision, the conviction or sentence in the

event that the Court imposes a term of imprisonment of 151 months or below.  This waiver is

binding without regard to the sentencing analysis used by the Court.  The defendant waives all

defenses based on the statute of limitations and venue with respect to any prosecution that is not

time-barred on the date that this agreement is signed in the event that (a) the defendant's

conviction is later vacated for any reason, (b) the defendant violates this agreement, or (c) the

defendant's plea is later withdrawn.  The defendant further waives the right to raise on appeal or

on collateral review any argument that (1) the statute(s) to which the defendant is pleading guilty

is unconstitutional and (2) the admitted conduct does not fall within the scope of the statute(s).

Nothing in the foregoing waiver of appellate and collateral review rights shall preclude the

defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.  The

defendant waives any right to additional disclosure from the government in connection with the

guilty plea.  The defendant agrees that with respect to all charges referred to in paragraphs 1 and

5(a) he is not a "prevailing party" within the meaning of the "Hyde Amendment," 18 U.S.C.

§ 3006A note, and will not file any claim under that law.  The defendant agrees to pay the special

assessment by check payable to the Clerk of the Court at or before sentencing.  The defendant

understands that he may be subject to removal as set forth in paragraph 14 below.  Nevertheless,

the defendant affirms that he wants to plead guilty and to waive his right to appeal as set forth at

the beginning of this paragraph, even if the consequence is the defendant's automatic removal

from the United States.

     5.    The Government agrees that:

     a.    no further criminal charges will be brought against the defendant for his participation, in and about and between 2009 and 2015, in the bribery of foreign officials and the laundering of money promoting or derived from that bribery, as alleged in the Indictment, it being understood that this agreement does not bar the use of such conduct as a predicate act or as the basis for a sentencing enhancement in a subsequent prosecution including, but not limited to, a prosecution pursuant to 18 U.S.C. §§ 1961 et seq., and at the time of sentence, it will move to dismiss the remaining counts of the Indictment with prejudice;

and, based upon information now known to the Government, it will

     b.    take no position concerning where within the Guidelines range determined by the Court the sentence should fall; and

c.   make no motion for an upward departure under the Sentencing
Guidelines.

If information relevant to sentencing, as determined by the Government, becomes known to the

Government after the date of this agreement, the Government will not be bound by

subparagraphs 5(b) and 5(c).  Should it be judged by the Government that the defendant has

violated any provision of this agreement, the defendant will not be released from his plea of

guilty but the Government will be released from its obligations under this agreement, including

but not limited to: (a) moving for the additional one-level downward adjustment for timely

acceptance of responsibility described in paragraph 2 above; and (b) the provisions of paragraph

5(a)-(c).

6.      The defendant agrees that any statements made by the defendant under

oath during the plea proceeding and in the Factual Proffer (attached as Exhibit A to this

agreement) will be admissible against the defendant in any criminal case involving the

Government and the defendant as: (a) substantive evidence offered by the Government in its

case-in-chief and rebuttal case; (b) impeachment evidence offered by the Government on cross-

examination; and (c) evidence at any sentencing hearing or other hearing, notwithstanding any

other subsequent event, including but not limited to the defendant's withdrawal or attempted

withdrawal of his guilty plea, or the court's refusal to accept the defendant's guilty plea.  If the

defendant violates any provision of this agreement, prosecutions for crimes currently known and

unknown to the Government that are not time-barred by the applicable statutes of limitation on

the date this agreement is signed may be commenced against the defendant notwithstanding the

expiration of the statute of limitation between the signing of this agreement and the

commencement of any such prosecutions.  If any such prosecutions are brought, subject to the

provisions of Paragraph 15, the defendant waives all claims under the United States Constitution,

5

Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of

Evidence, or any other federal statute or rule that statements made by the defendant on or after

August 14, 2018, including any statements made by the defendant under oath during the plea

proceeding, or any leads derived therefrom, should be suppressed.

    7.  The defendant acknowledges that he obtained and/or acquired property

that is subject to forfeiture as a result of his violations of 18 U.S.C. § 1956(h), as alleged in the

above-captioned Indictment.  The defendant consents to the forfeiture of: (a) eighteen million

eight hundred ninety-two thousand five hundred thirty-two dollars and forty cents

($18,892,532.40) (the "Forfeiture Money Judgment"); and (b) all right, title and interest in the

following assets (the "Forfeitable Assets"): (i) all funds on deposit at Bank Vontobel AG (the

"Vontobel Funds") in Switzerland in account nos. 10.520976-6 and 10.328862_1, held in the

names of Diamong Investments Corp. and Waterspoon International Ltd., respectively; (ii) all

funds restrained by U.S. Immigration and Customs Enforcement in connection with Luis Enrique

Martinelli Linares's immigration bond, file no. A***-**4-620, Bond Receipt no.

KROC1900454, and associated with Treasury Account Symbol 70X6697 Fund Code 05 (the

"Bond Funds"); (iii) all funds held in the attorney escrow account at International Finance Bank

held for the benefit of defendant (the "IFB Funds"); (iv) all funds held in the attorney escrow

account in Switzerland for the benefit of the defendant and Luis Enrique Martinelli Linares (the

"Swiss Escrow Funds"); (v) the real property and premises (the "Miami Condo") located at Icon

Tower, 495 Brickell Avenue, Apt. 4701, Miami, FL, 33133; and (vi) six hundred sixty-nine

thousand forty-seven dollars and twenty cents ($669,047.20) U.S. Currency (the "U.S.

Currency").  The defendant agrees that the amount of the Forfeiture Money Judgment, the

Forfeitable Assets and any payments toward the Forfeiture Money Judgment represent property

involved in the defendant's violations of 18 U.S.C. § 1956(h) and/or substitute assets, and thus are forfeitable to the United States pursuant to 18 U.S.C. §§ 982(a)(l) and 982(b)(1), in any administrative and/or judicial (civil or criminal) proceeding at the Government's exclusive discretion.  The defendant consents to the entry of a Preliminary Order of Forfeiture, pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, imposing the Forfeiture Money Judgment and forfeiting the Forfeitable Assets.  If forfeited to the United States in accordance with the provisions set forth below—and/or in the case of the Vontobel Funds and the Swiss Escrow Funds, if forfeited to the government of Switzerland—the Forfeitable Assets shall be credited towards the Forfeiture Money Judgment.  The defendant shall assist with the repatriation and/or forfeiture of the Forfeitable Assets as follows:

a.      <u>The Vontobel Funds and the Swiss Escrow Funds</u>.  The defendant agrees to take all necessary steps as directed by the Government in the repatriation of the Vontobel Funds and the Swiss Escrow Funds, including the execution of a consent directive for the transfer of the Vontobel Funds and the Swiss Escrow Funds, to an account designated by the Government.  In the event that any portion of the Vontobel Funds and the Swiss Escrow Funds is returned to the defendant, or any other person, the defendant consents to, and will assist in, the repatriation and/or surrender of such funds for forfeiture proceedings in the United States in accordance with this agreement.

b.      <u>The Miami Condo</u>.  The defendant consents to the forfeiture and sale of the Miami Condo, and will assist in all necessary steps including the execution of any and all documents necessary to consummate the sale of the Miami Condo, to convey clear title of the property to a third-party buyer, and to further implement the terms of such sale, including the production of any and all documents and/or information relating to the Miami Condo in the

defendant's possession, or otherwise request that third parties in possession of such documents and/or information make them readily available for the Government's receipt.

        c.      <u>The U.S. Currency</u>.  The defendant agrees to deliver to the Government prior to the Guilty Plea a money order, certified check or official bank check payable to the "United States Marshals Service" in the full amount of the U.S. Currency.

        8.      The Forfeitable Assets shall be forfeited as soon as practicable within the time periods set forth above and credited against the amount of the Forfeiture Money Judgement. The remaining amount of the Forfeiture Money Judgment shall be paid in full no later than thirty (30) days (the "Due Date") in advance of the date that the defendant is first scheduled for sentencing.  All payments made by the defendant toward the Forfeiture Money Judgment shall be made by money order, certified check or official bank check, payable to the "United States Marshals Service."  The defendant shall cause said payment(s) to be sent by overnight mail delivery to Assistant United States Attorney Laura D. Mantell, United States Attorney's Office, Eastern District of New York, 271-A Cadman Plaza East, 7th Floor, Brooklyn, NY 11201, with the criminal docket number noted on the face of the instrument.  The defendant consents to the restraint of the Forfeitable Assets and all payments made toward the Forfeiture Money Judgment. The defendant also waives all statutory deadlines with respect to the Forfeitable Assets and all Forfeiture Money Judgment payments, including but not limited to deadlines set forth in 18 U.S.C. § 983.

        9.      If the defendant fails to pay any portion of the Forfeiture Money Judgment or forfeit any of the Forfeitable Assets on or before the Due Date, the defendant consents to the forfeiture of any other property of his up to the amount of the unpaid Forfeiture Money

Judgment, pursuant to 21 U.S.C. § 853(p), and further agrees that the conditions of 21 U.S.C.
§§ 853(p)(1)(A)-(E) have been met.

10.     The defendant agrees to fully assist the Government in the repatriation
and/or forfeiture of the Forfeitable Assets and in effectuating the payment of the Forfeiture
Money Judgment by among other things, executing any documents necessary to effectuate any
transfer of title to the United States.  Such assistance shall also include providing any evidence,
including any testimony, needed to seek the repatriation or forfeiture of the Forfeitable Assets
and/or to defend any third-party claims to such assets.  The defendant agrees not to file a claim
or petition seeking remission or contesting the forfeiture of any of the Forfeitable Assets or any
property against which the Government seeks to satisfy the Forfeiture Money Judgment in any
administrative or judicial (civil or criminal) proceeding.  The defendant further agrees not to
assist any person or entity in the filing of any claim or petition seeking remission or contesting
the forfeiture of any of the Forfeitable Assets or any property against which the Government
seeks to satisfy the Forfeiture Money Judgment in any administrative or judicial (civil or
criminal) forfeiture proceeding.

11.     The failure of the defendant to forfeit any monies and/or properties as
required under this agreement, including the failure of the defendant to execute any document to
accomplish the same on timely notice to do so, may constitute a material breach of this
agreement.  Upon such a breach, the defendant will not be entitled to withdraw the plea, but the
Government may bring additional criminal charges against the defendant.

12.     The defendant knowingly and voluntarily waives his right to any required
notice concerning the forfeiture of any monies and/or properties forfeited hereunder, including
notice set forth in an indictment, information or administrative notice.  In addition, the defendant

knowingly and voluntarily waives his right, if any, to a jury trial on the forfeiture of the

Forfeitable Assets and the entry of a Forfeiture Money Judgment, and waives all constitutional,

legal and equitable defenses to the forfeiture of said monies and/or properties, including, but not

limited to, any defenses based on principles of double jeopardy, the Ex Post Facto clause of the

Constitution, any applicable statute of limitations, venue, or any defense under the Eighth

Amendment, including a claim of excessive fines.

13.     The defendant agrees that the entry and payment of the Forfeiture Money

Judgment is not to be considered the payment of a fine, penalty, restitution loss amount or

payment of any income taxes that may be due, and shall survive bankruptcy.

14.     The defendant recognizes that pleading guilty may have consequences

with respect to the defendant's immigration status if the defendant is not a citizen of the United

States.  Under federal law, a broad range of crimes are removable offenses, including the offense

to which the defendant is pleading guilty.  Indeed, because the defendant is pleading guilty to

money laundering conspiracy, in violation of 18 U.S.C. § 1956(h), removal is presumptively

mandatory.  Removal and other immigration consequences are the subject of a separate

proceeding, however, and the defendant understands that no one, including the defendant's

attorney or the District Court, can predict with certainty the effect of the defendant's conviction

on the defendant's immigration status.  The defendant nevertheless affirms that the defendant

wants to plead guilty regardless of any immigration consequences that the defendant's plea may

entail, even if the consequence is the defendant's automatic removal from the United States.

15.     This agreement does not bind any federal, state, or local prosecuting

authority other than the Government, and does not prohibit the Government from initiating or

prosecuting any civil or administrative proceedings directly or indirectly involving the defendant.

Apart from any written proffer agreements signed August 14, 2018 and initialed on September

26, 2018, December 21, 2018, April 3, 2019, June 12, 2019, September 18, 2019 and October 30,

2019, no promises, agreements or conditions have been entered into by the parties other than

those set forth in this agreement and none will be entered into unless memorialized in writing

and signed by all parties.  Apart from any written proffer agreements, if applicable, this

agreement supersedes all prior promises, agreements or conditions between the parties.  To

become effective, this agreement must be signed by all signatories listed below.


Dated: Brooklyn, New York
      December 10 , 2021


BREON PEACE                JOSEPH S. BEEMSTERBOER
United States Attorney        Acting Chief, Fraud Section
Eastern District of New York    Criminal Division, Dept. of Justice


By: *Alixandra Smith*         By:
    Alixandra Smith          Michael Culhane Harper
    Assistant U.S. Attorney     Trial Attorney


11

Approved by:

_____

David Pitluck
Supervising Assistant U.S. Attorney


DEBORAH L. CONNOR
Chief, Money Laundering and
Asset Recovery Section
Criminal Division, Dept. of Justice


By: _____

Barbara Levy
Michael B. Redmann
Trial Attorneys


I have read the entire agreement and discussed it with my attorney. I understand all of its terms and am entering into it knowingly and voluntarily.

_____

RICARDO ALBERTO MARTINELLI LINARES
Defendant


Approved by:

_____

Sean Hecker
Counsel to Defendant

12

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA

           - against -

RICARDO ALBERTO MARTINELLI
LINARES,

                  Defendant.

FACTUAL PROFFER IN SUPPORT OF
GUILTY PLEA

21-CR-65 (RJD)

– – – – – – – – – – – – – – – – – X

       I, RICARDO ALBERTO MARTINELLI LINARES (the "defendant"), stipulate and agree that the information stated herein is true and accurate and a sufficient basis for my plea of guilty to the money laundering conspiracy in violation of Title 18, United States Code, Section 1956(h), charged as Count One of the Indictment in the above-captioned matter. Had this matter proceeded to trial, I stipulate and agree that the government would have proven the facts alleged below beyond a reasonable doubt and the forfeiture allegations set forth in the Indictment by a preponderance of the evidence.

       1.      Between August 2009 and September 2015, I knowingly and intentionally agreed with Luis Enrique Martinelli Linares and others to cause the wiring of funds, which were bribes from Odebrecht to a high-ranking public official of Panama and close relative of mine ("Panama Government Official"), into and out of the United States to promote violations of Panamanian law, i.e., the bribery of a Panamanian public official in violation of the Penal Code of the Republic of Panama. I also agreed to cause further transactions into and out of the United States with the proceeds of those same violations of Panamanian law, in part to conceal the nature, source, and control of the funds.

2.      As part of the above-described plan, I agreed to establish offshore bank accounts in the names of offshore shell companies to receive and disguise the payments and to serve as a signatory on certain of these accounts.  In total, from 2009 through 2012, these accounts received over $28 million in bribe proceeds from Odebrecht for the benefit of Panama Government Official.  More than $19 million of the payments were transferred through U.S. banks, some of which were located in New York.

3.      To advance the above-described plan, I agreed with Luis Enrique Martinelli Linares and others to cause the following wire transfers, among others, or knew that such wire transfers, among others, were foreseeable consequences of the above plan and agreement:

a.      The wiring of approximately $899,978.32 from a bank in Switzerland, through a bank in New York, New York, to a bank in Switzerland, on or about November 12, 2013.

b.      The wiring of approximately $30,887.21 from a bank in Switzerland, through a bank in New York, New York, to a bank in Switzerland, on or about December 10, 2013.

4.      The above-described agreements and acts were in relation to a scheme to receive money from Odebrecht's Division of Structured Operations to promote the bribery of Panama Government Official, conceal the source of the related funds, and transact in the proceeds of the Panama bribery scheme.  I agreed to use the following entities and accounts to facilitate this conduct:  Account No. 144232 at Banque Pictet, held in the name of Kadair Investment Ltd.; Account No. 510479-00 at Banque Lombard Odier Darier Hensch, held in the name of Fordel International Ltd.; Account No. 10.093384-9 at Notenstein La Roche Privatbank,

2

held in the name of Aragon Finance Corp.; Account No. 15221 at Banque Julius Baer & Cie, held in the name of Livorno International, Ltd.; Account Nos. 0124248AA and 0211741AA at BSI, SA, held in the names of Malvor Consultants and Kilmore Holdings International Inc., respectively; and Account No. 10.540671-8 at Notenstein La Roche Privatbank, held in the name of N 1 Los Condes, through Ascona Management Group Corp.; and Account Nos. 10.520976-6 and 10.328862_1 at Bank Vontobel AG in Switzerland, held in the names of Diamong Investments Corp. and Waterspoon International Ltd., respectively.  Other companies I agreed to utilize for the aforementioned purpose included Hofburg Capital Management Corp., and Amberes Capital, S.A.

5.      The preceding statement is a summary, made of the purpose of providing the Court with a factual basis for my guilty plea to Count One of the Indictment.  It does not include all the facts known to me concerning criminal activity in which I and others engaged.  I make this statement knowingly and voluntarily and because I am in fact guilty of the crime charged.

6.      This Factual Proffer is Exhibit A to the plea agreement that I have signed with the government in the above-captioned matter.

Dated:  Brooklyn, New York

_____, 2021


_____
Ricardo Alberto Martinelli Linares
Defendant


_____
Sean Hecker
Counsel for Defendant

3

# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X **Docket#**
UNITED STATES OF AMERICA,     : 21-cr-00065(RJD-2)
                              :
                              :
    - versus -                : U.S. Courthouse
                              : Brooklyn, New York
MARTINELLI LINARES, ET AL.,   :
                              : December 11, 2021
            Defendants        :
------------------------------X

TRANSCRIPT OF CRIMINAL CAUSE FOR ARRAIGNMENT
BEFORE THE HONORABLE ROBERT M. LEVY
UNITED STATES MAGISTRATE JUDGE

**A  P  P  E  A  R  A  N  C  E  S:**
**(VIA VIDEO/AUDIO)**


**For the Government**:        **Breon S. Peace, Esq.**
                              United States Attorney


                         BY:  **Alixandra Smith, Esq.**
                              **Michael Harper, Esq.**
                              **Barbara Levy, Esq.**
                              Assistant U.S. Attorneys
                              271 Cadman Plaza East
                              Brooklyn, New York 11201


**For the Defendant**:         **Sean Hecker, Esq.**
                              **Justin Horton, Esq.**
                              Kaplan Hecker & Fink LLP
                              350 Fifth Avenue, Suite 7110
                              New York, NY 10118


**Transcription Service**:     **Transcriptions Plus II, Inc.**
                              61 Beatrice Avenue
                              West Islip, New York 11795
                              RL.Transcriptions2@gmail.com


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1        THE CLERK:  We're here for an arraignment in
2    *United States v. Ricardo Martinelli Linares*, Case Number
3    21-cr-65.  Would counsel state their appearances for the
4    record beginning with the government?
5        MS. SMITH:  Good afternoon, your Honor.
6    Alixandra Smith for the United States.  And with me on
7    the line are also trial attorneys Michael Harper and
8    Barbara Levy from the Department of Justice.
9        THE COURT:  Good afternoon.
10       MR. HECKER:  Good afternoon, your Honor.  Sean
11   Hecker from Kaplan, Hecker & Fink for Mr. Martinelli
12   Linares, and I'm joined by my colleague, Justin Horton.
13       THE COURT:  Good afternoon.  Good afternoon,
14   sir.  How do you like to be referred to, Mr. Martinelli
15   or Mr. Martinelli Linares?
16       THE DEFENDANT:  Hello, your Honor.  Mr.
17   Martinelli is fine.
18       THE COURT:  Okay.  All right.  So Mr.
19   Martinelli, can you hear me well?
20       THE DEFENDANT:  Yes, your Honor.
21       THE COURT:  And are you in the same room with
22   your lawyer?
23       THE DEFENDANT:  Yes, I am, your Honor.
24       THE COURT:  Are you able to speak to him and --
25       THE DEFENDANT:  Yes, I am.

3

Proceedings

1          THE COURT:  Can you do so privately if you need
2   to?

3          THE DEFENDANT:  Yes, your Honor.

4          THE COURT:  Okay.  And you can do that by
5   muting the mic if you need to.

6          All right.  So the first order of business
7   today is that we're all appearing by video.  The only
8   individuals who are in the same room are Mr. Martinelli
9   and his counsel.  The reason we're appearing by video
10  today is because we're still in the midst of a pandemic
11  and it is considered not safe for us to all appear in a
12  courtroom at this time.

13         Mr. Martinelli, you do have a right, however,
14  to appear live and in person in a court proceeding with
15  all the parties there.  And so the question I'm going to
16  ask you is whether after consulting with your lawyer you
17  are willing to waive your right to appear in person and
18  live at this time and to proceed remotely.  Let me ask
19  that question to your lawyer first.

20         MR. HECKER:  Yes.

21         THE COURT:  Have you discussed it with your
22  client?

23         MR. HECKER:  I have, your Honor, and he's
24  prepared to waive his in person appearance today.

25         THE COURT:  Mr. Martinelli, is that true?  Do

4

Proceedings

1  you waive your in person appearance today?

2          THE DEFENDANT:  Yes, your Honor.

3          THE COURT:  Are you making this decision

4  voluntarily?

5          THE DEFENDANT:  Yes, your Honor.

6          THE COURT:  Anybody force you or threatened you

7  or made you any promises to induce you to proceed

8  remotely?

9          THE DEFENDANT:  No, your Honor.

10          THE COURT:  And do you have any questions about

11  how this process works?

12          THE DEFENDANT:  No, your Honor.

13          THE COURT:  All right.  I'm going to advise you

14  that you have a right to remain silent.  Anything you say

15  here today can be used against you.  Even if you've

16  already made statements to the government, you don't have

17  to say anything else.  Because you and your lawyer are so

18  close to each other, you can consult with each other

19  privately at any point and feel free to mute the mic if

20  that's what you wish to do.  Do you have any questions?

21          THE DEFENDANT:  No, your Honor.

22          THE COURT:  All right.  You're here today

23  following an extradition from Guatemala on an indictment

24  that has criminal charges against you.  Have you had a

25  chance to either read the indictment or discuss the

5

Proceedings

1  charges with your lawyer?

2              THE DEFENDANT:  Yes, your Honor.

3              THE COURT:  Do you understand the charges?

4              THE DEFENDANT:  I do, your Honor.

5              THE COURT:  I'm going to ask the government

6  very briefly to explain or summarize the charges against

7  Mr. Martinelli.

8              MS. SMITH:  Sure, your Honor.  The defendant

9  has been charged in a five count indictment.  He's

10  charged in the first three counts with one count of

11  conspiracy to commit money laundering, and two counts of

12  substantive money laundering for his involvement in

13  facilitating laundering more than $20 million in bribes

14  from a Brazilian company called Odebrecht to a senior

15  government official in Panama who is a close relative.

16              THE COURT:  Thank you.  Mr. Hecker, would you

17  like the Court to read the indictment publically?

18              MR. HECKER:  No, your Honor.  We'll waive

19  reading.

20              THE COURT:  And how does Mr. Martinelli plead?

21              MR. HECKER:  Your Honor, Mr. Martinelli has

22  signed a plea agreement and has a change of plea

23  proceeding scheduled for before Judge Dearie on Tuesday,

24  so we'll wait until Tuesday to formally enter his plea.

25  So for purposes of today's proceeding, he'll enter a not

6

Proceedings

1   guilty plea.

2        THE COURT:  Thank you.  What's the government's

3   position on -- well, let me advise you all that I have

4   read your papers and I've read the transcript of the

5   hearing for Mr. Martinelli's brother, Luis Martinelli,

6   before Judge Henry and Judge Dearie, so I'm familiar with

7   your arguments, but I would like to hear your argument on

8   the bail issue if you wish to present it.  Shall we start

9   with the government?

10        MS. SMITH:  Sure, your Honor.  As you said, we

11   filed sort of a ten-page letter as well as the transcript

12   of the bail hearings for Luis Martinelli, Mr.

13   Martinelli's brother and co-defendant, which took place

14   before Judge Henry and Judge Dearie.  And obviously, I

15   think a lot of the facts here are the same.

16        That said, our position is that the defendant

17   is a risk of flight and there are not conditions

18   sufficient to ensure his return to court for the duration

19   of this case.  And in any event, that the package that's

20   presented is certainly insufficient.

21        So as set forth in our papers, the defendant is

22   a risk of flight given the nature and seriousness of the

23   crimes which I have just described.  And we've identified

24   sort of more information for you on the senior government

25   official involved in a sealed filing that was provided to

7

Proceedings

1  you which the defense also has.  And obviously, the

2  weight of the evidence which I think is made clear by the

3  fact that the defendant fled in June of 2020 sort of

4  knowing what the evidence was and being engaged in plea

5  negotiations and the fact that he's agreed to plea on

6  Tuesday.  So that factor obviously weighs in favor of

7  detention.

8       We've described in some detail the flight from

9  the United States in June 2020.  There were not charges

10  pending at that time but the parties were engaged in plea

11  negotiations and were exchanging papers and very close to

12  sort of finalizing a plea.  And as we set forth our

13  papers, the defendant and his brother left the United

14  States without informing the government, used a private

15  jet to evade U.S. border patrols, and then sort of

16  hopscotched around Central America in an attempt to get

17  back to Panama which was locked down because of the COVID

18  19 crisis.

19       He used invalid diplomatic credentials to cross

20  the border into Guatemala which said he was a member of

21  the Central American Parliament and he was not.  And then

22  he and his brother got a waiver from the Panama Ministry

23  of Health to get back into Panama when the country was

24  locked down and was arrested on a private jet in

25  Guatemala that was destined back for Panama.

8

Proceedings

1      So he obviously went to great lengths to flee
2  the United States at that time.  And he did so even
3  though there were charges pending in the criminal case in
4  Panama.  And so he made the decision at that time that he
5  would fare better there which is sort of the same
6  circumstances that were here.  And once he was in
7  Guatemala and had been arrested, he fought extradition.
8  He did so until the point at which his brother, you know,
9  his appeals were exhausted and was going to be
10  extradited.  And at that point only agreed to waive his
11  remaining challenges and be extradited to the United
12  States.

13      So obviously, that flight, which I think Judge
14  Dearie in particular found very persuasive and I think
15  shows that the defendant has the means and also the
16  incentive to flea because like I said, the charges that
17  are described in his papers were pending in Panama in
18  June of 2020 just as they are today.

19      He obviously has extensive political
20  connections in Panama, extensive family wealth.  In
21  addition to the I believe 3.2 million in cash and 4.2
22  million in real estate that's detailed in the Pretrial
23  Services report, he obviously has access to extensive
24  family wealth.  He has citizenship in both Panama and
25  Italy.  And obviously that Panama does not extradite its

9

Proceedings

1    own citizens is another fact.

2          And then in addition to everything else, the

3    package that's been presented is insufficient, so we

4    don't believe that there's any package that would be

5    sufficient, but this one in particular is definitely not.

6    It represents a tiny fraction of his person wealth.  Not

7    just what was again disclosed in the Pretrial Services

8    report but also what he has access to through his family.

9    It is dwarfed by the almost $19 million in forfeiture

10   obligations that he will be on the hook for once he

11   pleads on Tuesday.  And we have no information on the

12   suretors.  They're described only as close friends.  We

13   have no idea sort of who they are, what moral suasion

14   they might have over the defendant, what their wealth is

15   such that the percentage of what they might be willing to

16   put up for the bond, sort of what that impact would be on

17   those suretors.  And I note that Pretrial Services was

18   not able to contact any of them this morning.  And I also

19   just note that it is a smaller package than was presented

20   by his brother before Judge Dearie and was rejected.

21          And then the final point that I'll make which

22   we made in our papers was that Mr. Martinelli is going to

23   plead guilty on Tuesday as scheduled.  The presumption

24   then flips for him to show that he is not a risk of

25   flight from the presumption that we're dealing with now.

Proceedings

10

So that's even a higher burden if he does in fact plead
on Tuesday.

THE COURT:  Thank you.  Mr. Hecker?

MR. HECKER:  Yes, your Honor.  Thank you.

We're prepared to treat this as if he has
already pled guilty because he signed a plea agreement
last week after much back and forth with the government
and he did so because he made a decision.  He made a
decision some time ago to voluntarily return to this
country, resolve these charges, attempt to do so in a way
that would result in protection from subsequent
prosecution for the same underlying conduct in Panama
which is the reason that the parties have negotiated a
proper statement of facts which is not, you know, typical
in this district.

And he did all of those things because he
obviously at this juncture has every intention of
resolving this case, pleading guilty on Tuesday, and
going before Judge Dearie and asking for a sentence of
time served.  The reason he's asking for a sentence of
time served is because it's an incredibly reasonable
sentence under all of the facts and circumstances of this
case.  Mr. Martinelli Linares has been in Guatemala in
prison for over 17 months.  He and his brother are
accused of being effectively middlemen in a corruption

Proceedings

1  scheme involving the Odebrecht scandal which Ms. Smith

2  made reference to.

3         The only other defendant has been successfully

4  prosecuted in the United States was the CEO of Braskem.

5  In that case, the government agreed to recommend a

6  sentence of no more than 60 months imprisonment before

7  Judge Dearie.  Judge Dearie gave Mr. Grubisich 20 months

8  in prison.  He will not serve more than the 17 months

9  that Mr. Martinelli and his brother have already served.

10        And under the circumstances, there is no

11  logical reason in the world for Mr. Martinelli to plead

12  guilty and then go back to Panama.  It would disrupt the

13  entire justification for the proceeding that we're moving

14  forward with on Tuesday and for sentencing.

15        To the extent that the bail package that we've

16  offered in the government's view, or in the Court's view

17  more importantly, is insufficient, we're prepared to

18  bolster it.  We in fact provided Pretrial Services with

19  the names of seven friends.  We gave cell numbers.  We

20  identified all of these people.  And I think the Pretrial

21  Services officer will confirm that it wasn't a function

22  of her not being able to contact these people because

23  they didn't pick up or something, it's because she didn't

24  have time this morning to do it.  But these are all

25  people who know our client well from school when he

Proceedings

1    attended Georgetown University from his subsequent time

2    in San Francisco.  These are close friends, people

3    willing to post property if need be.  We had in our

4    letter made a proposal of a package, a four and a half

5    million dollar personal recognizance bond secured by $1

6    million of his own funds, plus security from these other

7    suretors.  We're prepared to increase that to the extent

8    that it's the sufficiency of the package we're talking

9    about.

10             But I have to say the logic of where we are

11   makes very clear that he is not a flight risk.  It would

12   be a completely irrational decision to take.  He doesn't

13   have his travel documents.  Counsel's in possession of

14   his Panamanian passport.  His Italian passport, which he

15   has by reason of his birth, is already in ICE custody as

16   far as I understand it.  And there is no reason for him

17   to flee.  So we view this as a very simple argument.  The

18   circumstances are actually different from those that were

19   before Judge Dearie when the government suggested that

20   maybe it wasn't clear whether the plea would go forward.

21             Mr. Martinelli's brother has already pled

22   guilty.  He's going to be -- he himself is going to plead

23   guilty on Tuesday and there is literally no reason for

24   him to flee.

25             If I might just make a couple of other brief

13

Proceedings

1   points which were referenced in our letter but I think

2   important, if he's detained pending sentencing, he'll be

3   staying at the MDC.  He's had two vaccination shots and a

4   booster shot.  Notwithstanding that, and notwithstanding

5   our providing all of that information to legal at the

6   MDC, we're told he must be quarantined.  It appears he's

7   going to be quarantined in a small cell with another

8   recent arrestee.  His brother spent 18 days in

9   quarantine.  Quarantine means being in your cell for all

10  but 30 minutes a day every other day.  You get 30 minutes

11  out of your cell.  It is frankly inhumane to be treated

12  that way.

13         My client doesn't need to be treated that way

14  but yet MDC is insisting on a quarantine status which is

15  supposed to be 14.  As I said, his brother had 18 days.

16  And we think that's another reason for granting bail in a

17  case like this.  It would be unduly punitive,

18  unnecessarily punitive to hold him at the MDC pending

19  sentencing in this case.

20         THE COURT:  All right.  Thank you.  Is there

21  anything else the government would like to say?

22         MS. SMITH:  Yes, your Honor, just to very

23  briefly respond.  With respect to Mr. Grubisich, who's

24  the other Odebrecht defendant that Mr. Hecker referred

25  to, his sentence was actually capped at ten years because

14

Proceedings

1  he pled to very different charges.  He did not plead to

2  money laundering charges.  He didn't flee the country in

3  connection with his case.  And he actually had a

4  significant bail package that he was released on at $30

5  million and a number of suretors including family

6  members.  And I do think that the sentencing factors are

7  going to weigh differently for these defendants than for

8  Mr. Grubisich.

9          In terms of the argument that it would be

10 irrational to flee at this point, I do point out this is

11 the exact point that we were at in June 2020 when the

12 defendant chose to leave the country.  And as we set

13 forth in our filing, I think there's a real question

14 about this idea of wrapping up the charges here and in

15 Panama that the charges there may not carry the same kind

16 of serious sentence and that given the nature of the

17 political connections, that the consequences there may

18 not be as serious here and that is a reason to flee.

19         In terms of the travel documents, obviously

20 we've seen that the defendant can access diplomatic

21 credentials that were invalid and sort of otherwise

22 access ways to get into the country that are not the

23 standard approach for most Panamanian citizens.  The

24 waiver that they got in June 2020 was one that was not

25 available to everyday citizens.  So I think the idea that

15

Proceedings

1  certain of his travel documents are in the possession of

2  ICE or Pretrial is not sufficient here.

3           And finally on the MDC point, I just want to

4  put on the record that there is a mandatory 14-day

5  quarantine period.  The defendant's not treated any

6  differently than anybody else.  And for his brother, at

7  the end of the 14-day period there's another test that's

8  conducted, a PCR test, to determine whether or not the

9  defendant is still -- does not have COVID, and that did

10  take a number of days to come back which explains the 18

11  days.  And I think per BOP regs it actually says 14 to 21

12  days.  So it's obviously unfortunate but it is because of

13  the pandemic and those procedures were sort of followed

14  the same way with all defendants at the MDC.

15           MR. HECKER:  Your Honor, if I may just briefly?

16           THE COURT:  Yes.

17           MR. HECKER:  I mean the entirety of the

18  government's argument rests on this claim that it's the

19  exact same situation that existed when they left the

20  United States in June of 2020, and that's just obviously

21  not accurate.  There were no pending charges.  There were

22  plea discussions, but there were no pending charges.

23  There was no court order that they remain in the country.

24  I understand that the government's upset about the prior

25  set of circumstances.  It was unfortunate.  It was

Transcriptions Plus II, Inc.

16

Proceedings

1  obviously a mistake.  Our client spent 17 months in
2  Guatemalan prison in the interim.  His brother has
3  already pled guilty and he's pleading guilty on Tuesday.
4  I mean the notion that it's the same circumstances, I
5  mean it doesn't require a whole lot of thinking through
6  that logic to understand why it's simply wrong.
7         And it is true that the government agreed in
8  Mr. Grubisich's case to allow a plea to two counts, each
9  of which had a maximum of five years, and they
10  recommended five years and Judge Dearie gave two, but the
11  underlying conduct is he was the CEO of a company who
12  paid hundreds of millions of dollars in bribes.  And the
13  government hasn't suggested and couldn't possibly suggest
14  that Mr. Martinelli is more culpable than Mr. Grubisich.
15        So we feel quite strongly about our position.
16  Obviously that's going to be a decision for the judge to
17  make after getting a pre-sentence report.  But that's the
18  mind set of our client as he made the decision over a
19  month ago to give up his extradition fight and to come
20  here voluntarily to resolve this matter.  So it's just
21  not true that it's the same circumstance that existed
22  previously.
23        THE COURT:  All right.  Thank you both.
24        I've spent a lot of time thinking about this
25  case and I've read, as I said, I've read the transcripts

17

Proceedings

1  of the hearings, et cetera.  Under 3142(g), looking at

2  the factors that the Court has to consider, I don't think

3  there's a lot of disagreement about most of them.  The

4  nature of the offense, I think we all understand what the

5  offense was and it has serious ramifications.  The weight

6  of the evidence, I think the weight of the evidence is

7  great whether you make that conclusion because the

8  defendant has chosen to plead guilty or because of the

9  properties that have been made.  I just don't think

10  there's much dispute there.  The history and

11  characteristics of the defendant, again, I don't think

12  there's a lot in dispute about that.  And the real

13  question is whether or not there are conditions or a

14  combination of conditions under which he could be

15  released that would assure his appearance in court or

16  protect the community.

17          I don't see this as a danger to the community

18  case.  I think we're just talking about risk of flight.

19  And I think my decision isn't going to be made in a

20  vacuum.  It's being made in context of what's happened

21  over the last couple of years and particularly in the

22  context of Mr. Martinelli's brother's hearing before

23  Judge Dearie, what Judge Dearie said and what Judge Henry

24  had concluded.

25          So we'll start that Mr. Martinelli is not a

18

Proceedings

1  U.S. citizen.  He's a citizen of Panama and Italy.  He

2  doesn't have any deep roots in this district.  His family

3  resides primarily in Panama, a country that does not

4  provide for extradition of its citizens.  He does have

5  access to substantial financial resources.  He is

6  politically connected at very high levels of power in

7  Panama.  And he has used his influence and his resources

8  allegedly through bribes to influence others and also in

9  his escape, or at least his leaving the country a couple

10  of years ago in obtaining bogus identification cards and

11  an emergency humanitarian authorization to enter Panama.

12  So we know that his connections are not just theoretical

13  as to what they can do, but they could produce a result,

14  they could be deployed.

15            He left the United States before a plea was

16  finalized.  He did so in a way that as we see in other

17  cases would be described as trying to evade detection.

18  He took a boat to the Bahamas.  He took a private jet

19  that was headed for Panama where there is not an

20  extradition possibility.  It was through the vagaries and

21  the bad luck of COVID that the plane was turned away and

22  he had to go to Costa Rica, El Salvador, and ultimately

23  Guatemala.  He attempted to use a private family jet to

24  get him out of Guatemala to fly to Panama again using

25  diplomatic credentials that were not valid.  And he spent

19

Proceedings

1    a lot of time in Guatemala where he fought extradition

2    for a period of time and only after his brother's

3    extradition essentially was granted did he decide to give

4    up the battle.  There are a lot of reasons to say that he

5    chose to leave under circumstances that one might call

6    flight.

7            You know, judges have to make decisions in a

8    vacuum sometimes and often we're asked to have crystal

9    balls to decide whether a defendant is going to be

10   dangerous or going to flee.  We never know.  We can't

11   predict the future with all accuracy.  But what we can do

12   is we can look at past events and what happened.  The

13   strongest argument for the government is look at what

14   happened when he left the country and the way he did it

15   and the way he used his credentials and influence.  And

16   the defense's argument is well things have changed now.

17           I think Judge Dearie made clear how he views

18   the circumstances and I think ultimately he's right.  He

19   said in the old dictum fool me once shame on you, fool me

20   twice shame on me.  And I think where I ultimately come

21   down here.  And I think that there is a difference

22   between asking for release on bail today before the

23   guilty plea and asking for release after the guilty plea.

24   And that I think is where your strongest argument may

25   come after the plea of guilty has actually taken place,

20

Proceedings

1   something which was scheduled to happen, or not scheduled

2   to happen but anticipated, before, Mr. Martinelli, you

3   left the country.

4           So I do find that based on the facts of what

5   you have done in the past that you are a risk of flight

6   and all the factors I just discussed.  And I think it'll

7   be up to you and your lawyer to convince Judge Dearie

8   after the guilty plea on Tuesday that the circumstances

9   have indeed changed and that you can be trusted at that

10  point.

11          So my decision is that you are a risk of flight

12  at this point, but I'm not making any prediction or

13  statement as to whether or not you would continue to be a

14  risk of flight after you plead guilty.  So that's my

15  ruling.

16          And with respect to the MDC, I'm sorry to have

17  to put anyone in the MDC.  I've had enough experience

18  with the MDC, and I think the government has as well, to

19  know that it's not where we would like to send anyone.

20  But unfortunately, the COVID restrictions do have to

21  apply.  There's a reason for them.  And even if the Court

22  disagreed, the Court doesn't have any power to affect

23  those quarantines.  So that's the Court's ruling at this

24  time.

25          I'm going to read an order.  Under Federal Rule

21

Proceedings

1  of Criminal Procedure 5(f) I direct the prosecution to

2  comply with its obligation under *Brady v. Maryland* and

3  its progeny to disclose to the defense all information

4  whether admissible or not that is favorable to the

5  defendant material either to guilt or to punishment and

6  known to the prosecution.  Possible consequences for

7  noncompliance may include dismissal of individual charges

8  or the entire case, exclusion of evidence, and

9  professional discipline or court sanctions on the

10  attorneys responsible.

11          I will be entering a written order more fully

12  describing this obligation and the possible consequences

13  a failing to meet it, and I direct the prosecution to

14  review and comply with that order.  Even though a guilty

15  plea is scheduled for Tuesday, Brady certainly still

16  applies.

17          Ms. Smith, does the prosecution confirm that it

18  understands its obligations and will fulfill them even at

19  this late stage of the proceedings?

20          MS. SMITH:  Yes, your Honor.

21          THE COURT:  Okay.  Thank you.  Is there

22  anything else from the government?

23          MS. SMITH:  No, your Honor.

24          THE COURT:  From the defense?

25          MR. HECKER:  No, your Honor.

22

Proceedings

1           THE COURT:  All right.  And good luck, Mr.

2   Martinelli.  And my decision shouldn't cast any doubt as

3   to the quality of representation you received from Mr.

4   Hecker.  He did an excellent job.

5           THE DEFENDANT:  Thank you, your Honor.

6           THE COURT:  Thank you.

7                       (Matter concluded)

8                           -oOo-

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

23

# C E R T I F I C A T E

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **13th** day of **December**, 2021.

*Mary Greco*

Transcriptions Plus II, Inc.