KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE | 63RD FLOOR
NEW YORK, NEW YORK 10118

1050 K STREET NW | SUITE 1040
WASHINGTON, DC 20001

TEL (212) 763-0883 | FAX (212) 564-0883

WWW.KAPLANHECKER.COM

DIRECT DIAL    212.763.0889
DIRECT EMAIL   shecker@kaplanhecker.com

April 29, 2022

BY ECF

The Honorable Raymond J. Dearie
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

RE:  **<u>United States v. Ricardo Alberto Martinelli Linares</u>, 21 Cr. 65 (RJD)**

Dear Judge Dearie:

    We respectfully submit this memorandum on behalf of Ricardo Alberto Martinelli Linares ("Rica Martinelli") ahead of his sentencing with his brother, Luis, on May 20.  On the day of his sentencing, Rica will have spent nearly 23 months in prison in Guatemala and at the MDC.  He will appear before the Court having accepted responsibility for his participation in a conspiracy to pass bribes from a Brazilian construction company, Odebrecht, to a close family member who was a senior government official in Panama.  And he will have spent more time behind bars for this offense than the senior-most executive at a company that led the global bribery scheme in which Rica played a peripheral role as a pass-through for bad money.  Moreover, after this Court enters its sentence, Rica must still address pending criminal charges for the same conduct and the same fund transfers at its epicenter—and brought by the government most directly affected by this case—in Panama.

    Rica's crime was serious.  The Court heard him acknowledge the gravity of his misconduct at his plea hearing in December, and he is eager to express his contrition directly to the Court at his sentencing hearing.  Rica has paid—and will continue to pay—a life-changing cost for his conduct.  In view of his role in a much broader scheme, however, and compared to sentences in related cases, the nearly 23 months Rica has already served is more than "sufficient" to meet the purposes of our sentencing law.  And any additional term of incarceration would be "greater than necessary" to meet the law's requirements of proportionality and public protection.  18 U.S.C. § 3553(a).  For these reasons, we respectfully request a sentence of time served.

KAPLAN HECKER & FINK LLP

2

## I. Rica's Early Life: 1979-2008

Rica is the first-born son of Ricardo Martinelli Berrocal ("President Martinelli"), a prominent businessman and public official for decades before his election to Panama's presidency for a five-year term in 2009.[1] In many ways, Rica's early life was blessed. He was born into a family of considerable means, and he was raised by a warm and loving mother, Marta Linares de Martinelli. But Rica had a strained and distant relationship with his powerful father. As Rica's younger sister, Carolina, wrote to the Court, their father "wasn't present" while Rica, Luis, and Carolina were growing up—"[h]e was busy starting his political career and running the family business."[2] Absence was often replaced by acrimony when Rica and his father shared each other's space. Rica's childhood, for all of its material privileges, left him with bitter memories of being made to feel that—despite his academic success—he was poised to disappoint his father unless he met a seemingly unachievable standard of approval. And while Rica did not come out as gay to his parents until adulthood, he grew up made to feel ashamed that he would not always live the stereotypically masculine lifestyle that his father expected.

Realizing from a young age that he could not thrive in the shadow of his father's prominence and power, Rica left Panama as a teenager to study in the United States. At Georgetown University, he impressed his peers and formed lasting relationships: several of his classmates have written to the Court, decades later, to share the brilliant and ambitious Rica that they remember, and to urge mercy in sentencing.[3]

Unable to secure a sought-after U.S. work permit in the wake of the 9/11 attacks, Rica reluctantly returned to Panama. But he remained determined to be successful in his own right and under his own name. He began work not at his family's business but as an entry-level analyst at the Panama affiliate of a U.S. bank. Kristelle Getzler, who worked with Rica at Citibank in Panama, recalls his diligence at their first post-college job.[4] Maria Luisa de Arango, a friend and fellow Panamanian student at Georgetown, recalls Rica's efforts to establish the Panama chapter of the Georgetown alumni association.[5] Victoria Simanovskaya, a classmate of Rica's at Georgetown and later at the London Business School, recalls Rica helping her prepare for her job interviews while managing his own.[6] Ms. Getzler, Ms. Arango, and Ms. Simanovskaya's memories of their friend, fellow student, and colleague leave all three of them steadfast in the belief that Rica will make positive contributions to the world after he has served his sentence and paid his debts in this case.[7]

---

[1] See Mica Rosenberg & Sean Mattson, *Supermarket tycoon wins Panama election*, REUTERS (May 3, 2009), https://www.reuters.com/article/panama-election/update-5-supermarket-tycoon-wins-panama-election-idUSN0336935020090504 (describing President-elect Martinelli as "a U.S.-educated and self-made businessman who owns the dominant Super 99 supermarket chain").

[2] Letter from Carolina Martinelli, Ex. A at 1.

[3] *See* Letter from Kristelle Getzler, Ex. I; Letter from Maria Luisa N. de Arango, Ex. J; Letter from Victoria Simanovskaya, Ex. O.

[4] Getzler Letter, Ex. I at 1.

[5] *See* Arango Letter, Ex. J at 1.

[6] *See* Letter from Victoria Simanovskaya, Ex. O at 1.

[7] *See id.*; Getzler Letter, Ex. I at 1-2; Simanovskaya Letter, Ex. O at 2.

KAPLAN HECKER & FINK LLP

3

In 2004, after working for himself for two years, Rica sought increased financial and social independence from his increasingly prominent family. He enrolled at the London School of Economics. After earning a master's degree in political science, Rica began studying for an MBA at the London Business School, in the hopes of making a name for himself in business.

During a trip home to Panama for a wedding in 2005, Rica and his father got into one of the worst arguments that he can remember in a lifetime of tumult. The topic confirmed Rica's childhood fears: his father, by that point a powerful political figure,[8] confronted him about Rica's "rumored" homosexuality. He urged Rica to be seen with women to protect his father's and his family's reputation. And he made clear, in word and by implication, that he was not only disappointed in his son but able to mete out consequences by changing the terms of Rica's expected inheritance.

The episode was a stark illustration of the psychological power that President Martinelli wielded over his first-born son. It would stay with Rica, then 25 years old, for the rest of his life. At once, his father's conditional love created two opposing forces in Rica's life: a strong desire to win his father's approval, and a contrasting determination to succeed outside of the shadows cast by his father's power.

After the brief visit home in 2005, Rica returned to London. Two years later, after earning his MBA, he began work as a management consultant at McKinsey's London office. The achievement felt especially consequential. Here was a firm of unquestioned prestige, offering a fulfilling and remunerative job that Rica had earned for himself—far away from anyone who had heard of the Martinelli family.

For two years, from 2007 to 2009, Rica worked at McKinsey and enjoyed a life of independence and happiness in London. He lived openly and freely, sharing his life for the first time with a serious partner, and enjoying the company of friends and professional acquaintances from around the globe.

So it was with something approaching dread that Rica got a call in early 2009 from his mother, asking him to come home to Panama. The family's situation was changing. Rica's father was running again for president—this time with a serious chance of winning. He wanted his sons, Rica and Luis, to work for his campaign and prepare to manage the family's supermarket business if he won the presidency. Rica knew why his mother was tasked with making the request. His father, a master manipulator and a shrewd political operator, saw an opportunity to get what he wanted by leveraging Rica's warm maternal relationship.

II.     Rica's Return to Panama and Insinuation into the Bribery Scheme: 2009

On a promise that he was being asked only for short-term assistance, Rica took a six-month leave of absence from McKinsey in early 2009 and returned to Panama. His plan was to satisfy his mother's request and provide a few months of support to developing a transition plan for his family's business. Rica's hope was to return as soon as possible to the life he was building for himself in London. But it was also clear to him that, for the first time in his life, his father seemed to need Rica

---

[8] *See, e.g.*, William C. Banks, POLITICAL HANDBOOK OF THE WORLD 897 (2005) (describing Ricardo Martinelli Berrocal as "2004 presidential candidate and President of the [Democratic Change] Party").

KAPLAN HECKER & FINK LLP

4

more than the other way around. The chance to prove himself valuable—and, perhaps, to win some additional affection and approval from his father—was tantalizing. As successful as he had become, Rica still felt the shame and sadness of not earning his father's love.

### III. The Offense Conduct in this Case: 2009-2015

Rica's trip home to Panama proved not to be for as short a term as he imagined. And while he did not know it when he left London, he was heading to the site of the worst thing he would ever do and the biggest mistake he would ever make with his life. Not long after his arrival home in early 2009, his father won the election and was elected Panama's president. Soon thereafter, Rica was asked to be an intermediary, along with his brother, Luis, for payments from Odebrecht to a close member of their family. The Panamanian bribes were paid from 2009 to 2012, and Rica and Luis pled guilty to a related U.S. money laundering conspiracy that lasted through 2015. Rica accepts full responsibility for saying "yes" when asked to break the law—a choice for which he holds himself accountable, and for which he has already caused himself to experience years of calamitous consequences.

Rica's case sits on the outer periphery of "a massive and unparalleled bribery and bid-rigging scheme for more than a decade, beginning as early as 2001,"[9] about a decade before his fateful involvement, when he was a college student at Georgetown University. The payments that he and Luis agreed to help move from a Brazilian corporation to their Panamanian-politician family member represent about 3% of the bribes that Odebrecht and Braskem admitted to paying to politicians in dozens of countries over as many years. And last October, this Court sentenced Jose Grubisich—the Braskem CEO who personally "agreed to create an off-the-books slush fund" to pay $250 million in bribes[10]—to twenty months in prison. *See* Judgment, *United States v. Grubisich*, No. 19-CR-102 (RJD), ECF No. 102 (E.D.N.Y. Oct. 12, 2021). The Court witnessed Rica's acknowledgment of his responsibility and contrition for his actions at his December plea hearing. His allocution is reprinted below,[11] and Rica, Luis, and the government agreed to a factual proffer to accompany their plea agreements.[12]

---

[9] Press Release, U.S. Dep't of Justice, *Odebrecht and Braskem Plead Guilty and Agree to Pay at Least $3.5 Billion in Global Penalties to Resolve* Largest *Foreign Bribery Case in History* (Dec. 21, 2016), https://www.justice.gov/opa/pr/odebrecht-and-braskem-plead-guilty-and-agree-pay-least-35-billion-global-penalties-resolve.

[10] Gov't Sent. Mem., *United States v. Grubisich*, No. 19-CR-102 (RJD), ECF No. 97 at 1 (E.D.N.Y. Sept. 15, 2021).

[11] "Between August 2009 and September 2015 I agreed with other people, including my brother Luis, to wire funds that were the proceeds of bribes paid by Odebrecht to a family member of mine who was a government official in Panama. We caused those funds to be wired into an account in the United States to facilitate the bribery of the government official in Panama, which was in violation of Panama law. And I also agreed to cause further transactions into and out of the United States with proceeds of the same bribery scheme, in part to conceal where they came from and who they were for. I also agreed to establish offshore bank accounts in the names of offshore shell companies in order to receive and disguise the bribe payments and to serve as a signatory on some of those accounts. Between 2009 and 2012, $28 million in bribe proceeds from Odebrecht were transferred into the accounts for the benefit of a senior official in Panama, with more than $19 million of those payments transferred to U.S. banks, some of which were located in New York."

[12] *See* Ex. Q (plea agreement); Ex. R (factual proffer in support of plea agreement).

KAPLAN HECKER & FINK LLP

5

**IV.     Rica Voluntarily Approaches U.S. Law Enforcement: 2018**

In 2018, Rica and Luis began meeting voluntarily with federal law enforcement officials concerning the United States' ongoing investigation into the global Odebrecht bribery scheme. These meetings were initiated by Rica and Luis—not by U.S. law enforcement.

Rica came forward to acknowledge his responsibility and to resolve his criminal liability. He did so at a time in his life when he had resumed his efforts at financial and social independence from his father. In 2015—at the end of the charged conspiracy period—Rica moved out of Panama, settling first in Spain. There, he met and fell in love with the man who would become his husband: Edward Goucher, a British businessman with a Ph.D. in chemistry who worked in product development and marketing in the life sciences industry. *See* Letter from Dr. Edward Goucher, Ex. C.

The next year, Rica and Ed moved together to California. They quickly made friends and became active and productive members of their community. Letters sent on Rica's behalf make clear what a formative period this was in Rica's life. Two people who met him for the first time around this time, just seven or eight years ago, wrote to the Court about the outsized impact Rica's friendship and counsel has made in their lives.[13] Okan Sengun is a San Francisco lawyer who runs a small but unusually impactful nonprofit. The LGBT Asylum Project provides legal representation and resources to people fleeing anti-gay persecution and seeking a life of freedom and security in the United States of America. This mission resonated deeply and personally with Rica. As Mr. Sengun tells it, Rica approached him at a social event to offer his assistance and wound up "literally sav[ing] our clients' lives" with "his generous donations" and volunteer work.[14]

It was against this backdrop that Rica and Luis approached U.S. law enforcement.

In November 2018, while their discussions with federal prosecutors were ongoing, the brothers were detained by ICE in Florida on immigration allegations. After their ICE arrest, Panamanian officials reiterated their intent to seek Rica and Luis's extradition to face the Odebrecht-related Panama criminal charges which remain pending in Panama today. The brothers were ultimately released from ICE detention on bail and remained in the United States, where they continued meeting with federal law enforcement. In these discussions, the DOJ and FBI repeatedly assured Rica and Luis that they would arrange for a deferred action letter that would permit the brothers to remain in the United States and avoid repeated arrest and detention by ICE.

The COVID-19 pandemic began in March 2020. In the ensuing months, the pandemic's enormity and endurance became clearer, and the brothers grew concerned that the promised deferred action letter would never appear. They were living under the threat of sudden deportation following detention in inhumane ICE facilities being ravaged by the coronavirus. Under these circumstances, Rica and Luis made a serious and ill-considered mistake: they quietly departed the United States for Panama, seeking to return home to their family for the first time in many years and defend themselves

---

[13] *See* Letter from technology executive Remy Rosenbaum, Ex. N; Letter from business strategist at a prominent U.S. firm, Andrew Wisnewski, Ex. M (recalling Rica helping him through a "professional crossroads" and providing thoughtful counsel about personal and professional matters).

[14] *See* Letter from Okan Sengun, Esq., Ex. H (noting that "[w]ords can't express the impact [Rica's] support has made to some of the most vulnerable members of the LGBTQ community").

KAPLAN HECKER & FINK LLP

against the Odebrecht-related Panamanian criminal charges. When they exited this country in June 2020, the United States had not charged them with any crimes, although, of course, it was understood that such charges were likely forthcoming.

On July 6, 2020, after their travel was frustrated by various pandemic-related closures, the Martinelli brothers were arrested at the airport in Guatemala City, Guatemala, as they boarded a flight to Panama.

### V. Rica Spends Nearly 23 Months in Prison: 2020-2022

#### A. Rica's More than 17 Months in Guatemalan Prison

Rica spent more than 17 months in a Guatemalan prison. His aunt, Ileana Linares de de la Guardia, "experienced the raw evidence of his devastation, depression, and loneliness" when she visited him at the Mariscal Zavala prison in Guatemala City.[15] She recalls Rica taking responsibility for his terrifying and devastating predicament—he told her about his "regret and shame" for his "mistakes, recklessness, and bad decisions."[16] And Rica told his aunt that the was "haunted by the thought of the time he will not get to spend with his friends, his siblings, his parents, his family, because he is in jail."[17]

During his 17 months in the Guatemalan prison, he remained engaged with United States authorities through the undersigned counsel, who were retained in July 2020, following Rica's imprisonment. Through the undersigned, Rica continued efforts to resolve the pending United States investigation with a guilty plea. In December 2021, Rica waived an ongoing challenge to the process by which he was to be extradited from Guatemala, and agreed voluntarily to return to the United States to enter a guilty plea in this case.

#### B. Rica's Agreement to Plead Guilty and Repatriate Otherwise Unrecoverable Funds

Importantly, Rica's agreement with the United States consisted of much more than a guilty plea to the charge of money laundering conspiracy and the forfeiture of nearly $19 million in funds related to Odebrecht's Panamanian bribery scheme. Rica also agreed to repatriate considerable Odebrecht-related funds held in Swiss banks that would have been exceptionally difficult and perhaps impossible for the United States (and Panama, whose people are the only ultimate victims in this case) to recover without Rica and Luis's assistance. To be clear, many of these accounts were previously unknown to U.S. authorities, who learned of them from Rica and Luis.

#### C. Rica's 5 Months at an Unusually Restrictive MDC

Upon his return to the United States in early December 2021, Rica was remanded to the MDC. He arrived in the throes of the Omicron surge, when the already deplorable conditions at the MDC took a turn for the even worse. Rica's first seven days were spent in "administrative segregation"—the MDC's term for solitary confinement—as part of the MDC's attempt to respond to the then-surging

---

[15] Letter from Ileana Linares de de la Guardia, Ex. [X] at Y.

[16] *Id.* at Y.

[17] *Id.* at 2.

coronavirus.  Shortly after Rica was released from this extraordinary confinement, the MDC began a 52-day lockdown.  For weeks, Rica was locked in his cell for all of most days, and let out only for half an hour, three days a week.  In late January, the BOP responded to an outbreak of gang violence at a prison in Texas by locking down all its jails and prisons across the United States.  In this period, Rica and his fellow prisoners were confined to their cells all day for four days a week and let out only for *ten minutes* on the other three days.

When these extraordinary restrictions finally terminated in spring 2022, conditions at the MDC reverted to the intolerable state in which district judges had found them for months before Rica arrived.  For one example, Judge McMahon said that "there is no excuse" for what she referred to as the "disgusting" and "inhuman" conditions at the MDC and MCC—months *before* the latter's closure in Manhattan exacerbated the capacity-related mismanagement in Brooklyn.  *See United States v. Days*, No. 19-CR-0619, ECF No. 35 at 19 (S.D.N.Y. May 12, 2021).  For his part, Judge Oetken stated that "because it's been harsher than a usual period…it's been more punitive, that it's essentially the equivalent of either time and a half or two times what would ordinarily be served," referring to conditions at the MCC similar to the ones Rica experienced at the MDC.  *See United States v. Gonzalez*, No. 18-CR-669, ECF No. 250 at 17-18 (S.D.N.Y. Apr. 16, 2021) ("I think having served 24 months [under pandemic conditions at the MCC] is equivalent to having served three years.").

On the day of his sentencing, Rica will have spent 683 days—nearly 23 months—in prison in Guatemala and the MDC for the offense conduct under consideration by the Court.  Assuming the earning of good-time credit (Rica has no disciplinary record at the MDC), this is the equivalent of a sentence of more than 27 months.

**VI.    Sentencing Analysis**

The Guidelines provide a rough framework for the Court's preliminary assessment of an appropriate sentence.  Their purpose is generally to steer judicial decisions toward consistency—so that similarly situated defendants are treated alike, and disparate culpability is distinguished.  While this structure has merits, its mechanical application too often produces unjust results.  For that reason, the Guidelines were deprived of their mandatory force and have been advisory since *United States v. Booker*, 543 U.S. 220 (2005).  And they are "not to be presumed reasonable."  *Nelson v. United States*, 555 U.S. 350, 352 (2009).

Moreover, as this Court is well aware, the Guidelines are widely critiqued for using loss amount as a measure of culpability and the appropriate time to be served in cases of financial crime.  For that reason, courts are often confronted with advisory Guidelines ranges far in excess of the sentences they ultimately issue in such cases.  *See, e.g.*, Daniel S. Guarnera, *A Fatally Flawed Proxy: The Role of "Intended Loss" in the U.S. Sentencing Guidelines for Fraud*, 81 MISSOURI L. REV. 715, 716 (2016) (citing Sentencing Commission finding that "judges depart from the economic crime Guidelines at higher rates than almost any other major Guidelines provision").  *Grubisich* is a case in point.  With a Guidelines range of 235 to 293 months, and the government's request for the statutory maximum of 60 months, this Court ultimately sentenced the CEO of the major Odebrecht subsidiary who personally approved the payment of $250 million of bribes to 20 months in prison, based on the remaining Section 3553(a) sentencing factors.  *See United States v. Grubisich*, No. 19-CR-102 (RJD), Sent'g Tr. at 5:16-19, 17:12-15, 31:12-14 (E.D.N.Y. Oct. 12, 2021).

For the following reasons, we respectfully submit that this Court should deem the nearly 23 months that Rica served in prison—including many months in unusually harsh conditions at the MDC—as "sufficient, but not greater than necessary" to meet the purposes of sentencing under 18 U.S.C. § 3553.

### A. The Government Stipulated to the Correct Guidelines Calculation

The government and defense counsel agree on the Guidelines calculation for Rica's offense conduct. *See* Plea Agreement, Ex. Q at 2-3. Both parties objected to Probation's calculation of a higher range. The disagreement turns on whether the Guidelines for U.S. bribery offenses are applicable to a conspiracy to launder the proceeds of a foreign bribery crime.

Rica pled guilty to a single count of money laundering conspiracy under 18 U.S.C. § 1956(h). That provision prohibits agreements to move funds associated with certain "specified unlawful activit[ies]" to promote or conceal those underlying crimes. Rica's admitted agreement was to help move the proceeds of payments that were illegal under *Panamanian* law. *See* Indictment, ECF No. 12, at 1-2 (describing relevant "specified unlawful activities" as "an offense against a foreign nation involving bribery of a public official, in violation of the Penal Code of the Republic of Panama").

The money laundering Guidelines call for beginning with the base offense level of the underlying crimes if "the offense level for that offense can be determined." § 2S1.1(a)(1). But there are no determinable offense levels for foreign crimes. *See, e.g.*, *United States v. Azeem*, 946 F.2d 13, 17 (2d Cir. 1991). In such cases, the money laundering Guidelines call for beginning instead with a base offense level of 8. *See* § 2S1.1(a)(2). The government and defense counsel accordingly stipulated to a Guidelines calculation that begins with § 2S1.1(a)(2).

Probation disagreed. Their calculation started with a base offense level of 12, sourced from the Guidelines for the U.S. bribery statutes. *See* PSR ¶ 12. This is incorrect. Rica's conviction is for a money laundering conspiracy involving a violation of Panamanian law. The U.S. bribery Guidelines do not apply. *See, e.g.*, *United States v. Chao Fan Xu*, 706 F.3d 965, 993 (9th Cir. 2013), *abrogated on other grounds by RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325 (2016) ("Because Defendants' foreign conduct cannot be used to meet the requirements of § 2S1.1(a)(1)(A), the district court procedurally erred in applying that section to Defendants' sentences and we, accordingly, remand for resentencing under § 2S1.1(a)(2) in light of this conclusion."). And because the U.S. bribery Guidelines do not apply, Probation erred by adding enhancements from that section. *Compare* PSR ¶ 12 (adding enhancements intended only for violations of U.S. bribery statutes or for money laundering convictions with underlying crimes of U.S. bribery) *with, e.g.*, *United States v. Domenech*, No. 20-CR-20179, ECF No. 95 at 8 (S.D. Fla. Mar. 23, 2021) (prosecutor's explanation at sentencing for money laundering conspiracy that "the only [SUA] is offense against a foreign nation which does not have a specific guideline you can look to, *unlike the FCPA where you would look at 2C1.1*." (emphasis added)).[18]

---

[18] In *Grubisich*, Probation made similar errors and recommended a sentence much longer than the government's requested sixty months. This Court agreed with Grubisich's counsel that Probation's recommended sentence was "bizarre[]," and stated that, "at first I thought it was a typo, to be frank." *Grubisich*, No. 19-CR-102 (RJD), Sent'g Tr. at 15:9-15. We remain puzzled as to why Probation has not reconsidered its position here.

KAPLAN HECKER & FINK LLP

9

As stipulated by the parties, the correct Guidelines adjusted offense level is 31. This provides for a sentencing range of 108 to 135 months. While this range is still grossly untethered from a just outcome under the circumstances, it is well below Probation's *fifteen-year* recommended sentence, to say nothing of their calculated Guidelines range of up to twenty years in prison.

### B. The Guidelines Range is Grossly Inappropriate in this Case

Judges have roundly criticized the outsized force of the loss-amount factor in the Guidelines for financial crimes. *See, e.g.*, *United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006) (describing "the utter travesty of justice that sometimes results from the guidelines' fetish with absolute arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense"). This case is an exemplar. More than seventy percent of Rica's final offense level is a function of the dollar amount of other people's bribes that were connected to the money laundering conspiracy for which he has pled guilty. The resulting Guidelines range of 108 to 135 months is higher than what the government says is an appropriate sentence for a reputed "godfather" in an alleged violent street gang. *See* Gov't Sent'g Mem., *United States v. Mickey*, No. 20-CR-135, ECF No. 660 at 1 (S.D.N.Y. Apr. 25, 2022) (seeking sentence within Guidelines range of 92 months to 115 months for an alleged gang "godfather" who "soon reasserted his authority through brutal violence" after serving time for prior violent crimes).

The Court's ability to issue a sentence below the Guidelines range is a corrective measure for this kind of irrational calculation. Such a variance is needed here to arrive at a sentence that is "sufficient, but not greater than necessary" to account for the circumstances of Rica's offense, his history and characteristics, and the need to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a); *see also Rita v. United States*, 551 U.S. 338, 351 (2007) (recognizing possibility that "the Guidelines sentence itself fails properly to reflect § 3553(a) considerations").

### C. Rica's Actual Time Served Exceeds the Sentence of One of the Scheme's Ultimate Leaders

Last October, against a Guidelines range of 235 to 293 months (before a statutory cap) and the government's request of 60 months, this Court sentenced Jose Grubisich to 20 months in prison. *See* Judgment, *Grubisich*, No. 19-CR-102 (RJD), ECF No. 102 at 2 (E.D.N.Y. Oct. 25, 2021).

Mr. Grubisich was the CEO of Braskem, a major Odebrecht subsidiary that kicked in a quarter-billion dollars under his leadership to its parent company's "massive and unparalleled bribery and bid-rigging scheme."[19] Mr. Grubisich personally "agreed to create an off-the-books slush fund to divert funds from Braskem, to hide the existence of that slush fund through the use of offshore shell companies, to falsify Braskem's books and records in connection with payments into the slush fund, to pay bribes to Brazilian officials, and to provide false certifications to shareholders and regulators that concealed the bribery and fraud schemes." Gov't Sent'g Mem., *Grubisich*, No. 19-CR-102 (RJD),

---

[19] Press Release, U.S. Dep't of Justice, *Odebrecht and Braskem Plead Guilty and Agree to Pay at Least $3.5 Billion in Global Penalties to Resolve Largest Foreign Bribery* Case *in History* (Dec. 21, 2016), https://www.justice.gov/opa/pr/odebrecht-and-braskem-plead-guilty-and-agree-pay-least-35-billion-global-penalties-resolve.

KAPLAN HECKER & FINK LLP

10

ECF No. 97 at 1. This conduct included Mr. Grubisich's personal direction of the payment of a more than $4 million bribe to a Petrobras official to secure profits for his company. *Id.*

From his seat atop Braskem's management, Mr. Grubisich "had a direct role in causing the corruption at the heart of the [Odebrecht] investigation in Brazil." *Id.* at 7. And his culpability was exacerbated by his leadership role. At sentencing, the government told this Court that "the egregiousness of this conduct is not just because of what the defendant did, but also where he sat in the organization when he committed the crimes." Sent'g Tr. at 18-19, *Grubisich*, No. 19-CR-102 (RJD). As "the highest level executive," Mr. Grubisich "enabled, facilitated, and approved" the conduct of "a criminal enterprise"—"he helped put in place mechanisms to continue corrupt and fraudulent schemes at Braskem for almost a decade." *Id.* Mr. Grubisich's crimes were pure avarice: his and his corrupt enterprise's motives were to protect and grow their profits through bribery. He did not involve himself in a family member's crimes; he was asked by corporate colleagues, and not close loved ones, to commit the crimes he agreed to undertake.

Nor did Mr. Grubisich—who was arrested on his way to a vacation[20]—attempt to cooperate with U.S. authorities, or play a significant role in the recovery of funds for the U.S. or Brazilian governments. And he spent most of his pre-sentencing time outside of prison on house arrest, away from the lockdowns and violence at the MDC.

This Court, taking seriously its mandate to impose the parsimonious sentence, considered the nature of Mr. Grubisich's role in superintending Braskem's quarter-billion-dollar bribery scheme and weighed it against his compelling personal history and lifetime of good deeds alongside the need for deterrence of financial crimes and abuses of public trust. Your Honor found that "[t]here is no legitimate argument…for specific deterrence" because Mr. Grubisich "appears to be totally contrite and sincere." Sentencing Tr. at 29:24-30:3. Turning to general deterrence, this Court considered what sentence would avoid "enabling the system that is utterly corrupt to its bone" and "the impact of the sentence on, perhaps, others." *Id.* at 29:7-30:11. Your Honor ultimately sentenced Mr. Grubisich to 20 months in prison. *Id.* at 31:12-14.

One fundamental purpose of the sentencing law is "the need to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). While this "usually results because offenders in similar circumstances are given significantly different sentences," "the term may also be applied…to the imposition of similar sentences upon offenders in significantly different circumstances." *United States v. Joyner*, 924 F.2d 454, 459 (2d Cir. 1991). And "[a]lthough the main purpose of Section 3553(a)(6) is 'to minimize nationwide disparities,'" the Second Circuit "do[es] not 'object to district courts' consideration of similarities and differences among co-defendants when imposing a sentence.'" *United States v. Esso*, 486 F. App'x 200, 201–02 (2d Cir. 2012) (internal citation omitted). Applying this principle, Judge Arterton sentenced Lawrence Hoskins to 15 months in an FCPA case after previously sentencing a senior leader in the same scheme to 30 months. *Compare* Judgment, *Hoskins*, No. 12-CR-238, ECF No. 629 (D. Conn. Mar. 11, 2020) *with* Judgment, *United States v. Pierucci*, No. 12-CR-238, ECF No. 416 (D. Conn. Oct. 6, 2017). In imposing that lesser sentence, Judge Arterton "[gave] note to the

---

[20] *See* Frank G. Runyeon, *Brazilian Oil Exec Charged With Corruption Pleads Not Guilty*, Law360 (Nov. 20, 2019), https://www.law360.com/articles/1222007/brazilian-oil-exec-charged-with-corruption-pleads-not-guilty ("He had been arrested while traveling from Brazil with his wife for a vacation, his attorney said.").

## KAPLAN HECKER & FINK LLP

11

objective of avoiding disparities where the Court finds that Mr. Pierucci and Mr. Hoskins seem very differently positioned with Mr. Pierucci running the show by which a U.S. corporation was directly bribing and corrupting [foreign] officials for its own benefit[,] versus participation in the culture of corruption with eyes closed and significantly shorter time…without belittling [Mr. Hoskins's] significant culpability in directing activities of bribery." *Hoskins*, No. 12-CR-238, ECF No. 631 at 83.

At sentencing, Rica will have served nearly 23 months in prison in Guatemala and during a period of unusual tumult at the MDC. That is already at least ten percent more time than Mr. Grubisich will spend in prison, if he serves all of his 20-month sentence for helping to lead the Odebrecht scheme. Assuming Rica would have earned good-time credits if his time already served had been imposed as a sentence, his nearly 23 months equate to a sentence of more than 27 months. Indeed, no matter the Court's decision, Rica and Luis—middlemen at the end of a single spoke on the hub of the Odebrecht bribery machine—will have served more time in prison than *anyone else* for U.S. convictions in these broader cases.[21]

We respectfully submit that it would do an injustice to require Rica to serve even more time, exacerbating the disparity between the time served for a senior leader of a global bribery conspiracy and a peripheral actor who passed on money to enrich someone else.

### D. Additional Considerations Underscore the Justice of a Sentence to the Nearly 23 Months of Time Served

A sentence of to nearly 23 months of time served would also place Rica's punishment within the mainstream of sentences for even more culpable participation in global bribery schemes. In *United States v. Bourke*, No. 05-CR-518, (S.D.N.Y. Nov. 10, 2009), the Court sentenced a businessman who personally offered government officials millions of dollars of bribes in service of personal investment returns to a year and a day because, among other things, he "was in no way the originator" of the scheme. Sent'g Tr. at 17, 33-36, ECF No. 262. In *United States v. Garcia*, Judge Charles Breyer sentenced a businessman who paid bribes to Panamanian officials to secure a $14.5 million contract for his firm, and took nearly $100,000 in personal kickbacks along the way.[22] The Court noted that "for white collar offenders, an average sentence is somewhere in the neighborhood of 22 months for first-time offenders," and sentenced Mr. Garcia to that much time. Sent'g Tr., *United States v. Garcia*, No. 15-CR-366, ECF No. 22 at 20:9-21:3 (N.D. Cal. Jan. 14, 2016). And in *United States v. Perez*, the government opposed a minor-role adjustment for a participant in a broader bribery scheme because "he was the one that proposed the bribe scheme" to a co-defendant, and "[h]e also helped facilitate the first two bribe payments." No. 09-CR-20347, Sent'g Tr., ECF No. 68 at 5:11-19 (S.D. Fla. Mar. 11, 2011). The Court sentenced Mr. Perez to 24 months. *Id.* at 18:19-19:3.

Indeed, sentences in foreign bribery cases typically only exceed Rica's nearly 23 months of time served in the face of much more culpable conduct. The recent sentence in *United States v. Ng Lap Seng*, No. 15-CR-706 (S.D.N.Y. May 11, 2018) is illustrative. Mr. Ng, a businessman, "engaged in a massive, international bribery and money laundering scheme in which he paid more than $1

---

[21] Many of the "Operation Carwash" defendants sentenced in Brazil for their roles in Odebrecht-related bribery crimes received sentences to home confinement.

[22] *See* Press Release, U.S. Dep't of Justice, *Former Executive Sentenced for Conspiracy to Bribe Panamanian Officials* (Dec. 16, 2015), https://www.justice.gov/opa/pr/former-executive-sentenced-conspiracy-bribe-panamanian-officials.

KAPLAN HECKER & FINK LLP

12

million in bribes, in various forms, to two senior UN ambassadors" to obtain lucrative business from the United Nations.  Gov't Sent'g Mem., No. 15-CR-706, ECF No. 746 at 3.  Against a Guidelines range of 235 to 293 months, the government sought a sentence to "exceed 72 months."  *Id.* at 2.  The Court sentenced Mr. Ng to 48 months.  *See* Judgment, No. 15-CR-706, ECF No. 783 (S.D.N.Y. June 7, 2018).

      Rica's "history and characteristics" also underscore the needlessness of sentencing him to additional time.  For one thing, the Court can and should consider the impact on culpability of a defendant agreeing to a domineering family member's request to join them in a crime for the family member's benefit.  In the *Espada* cases, the Court sentenced Pedro Gautier Espada—a former city elected official and the son of a powerful state officeholder—to 6 months (against the government's request for 18 months) for aiding in his father's corruption scheme.  *See* Judgment, *United States v. Pedro Gautier Espada*, No. 10-CR-985, ECF No. 267 (E.D.N.Y. June 19, 2013).  Judge Block noted at sentencing that Gautier Espada "went to work for his father and was kind of under his father's dominant thumb.  We all know how dominant the father is." Sent'g Tr. at 19:20-20:11.  And while the son could not "escape the fact that he was not [*sic*] aware of what was going on" and—like Rica—was admittedly culpable for his participation, "we have the father looming large, as you might say, the 800-pound guerilla [*sic*] here."  *Id.*; *see also id.* at 29:8-24 (prosecutor agreeing that fact that "it was tough for him to say no to his father's misdeeds" was "worthy of consideration").

      A sentence to nearly 23 months in prison would also accomplish the law's purpose of providing specific and general deterrence.  The Court will hear directly from Rica on May 20 about his deep remorse and sincere contrition for agreeing to pass payments from Odebrecht.  Close friends and family members who have visited or spoken with Rica while he was incarcerated have shared with the Court their first-hand impressions of Rica's regret.  *See* Letter from Ed Goucher, Ex. C at 1 (Rica's ex-husband stating that "I know quite personally how contrite and remorseful Rica feels for the acts that led him to where he is today"); Letter from Ileana Linares de de la Guardia, Ex. D at 1 (Rica's aunt describing his "regret and shame" for his "recklessness, and bad decisions" that she saw when she visited him in the Guatemalan prison); *see also* Letter from Oscar Giovanni Jimenez Carrillo, Ex. P at 2 (describing how Rica was "living in an emotional jail" even before beginning to serve his prison time for this conduct).

      The nearly 23 months that Rica has already served may be the most forceful consequence he has earned for himself, *see, e.g.*, *United States v. Hoskins*, No. 12-CR-238, ECF No. 631 at 81 (D. Conn. Mar. 6, 2020) (weighing "difficult conditions of pretrial detention" as factor relevant to sentencing and deterrence), but they are far from the only consequences.  Rica's conduct cost him his marriage.  It did grave and at least partially irreparable damage to his good name.  And until his reputation is rehabilitated, Rica—a hard-working and aspiring businessman before his involvement with his family member's bribery scheme—has lost his ability to do business with respectable commercial partners, and hold accounts at many financial institutions, around the world.  Other consequences, while not pecuniary, are even more cutting.  Rica has shaved years off his free life.  Last summer, he missed one grandmother's funeral.  Earlier this year, he missed his other grandmother's 103rd birthday celebration.  Rica may well miss the birth of his first nephew in just a few weeks.  He has missed the births of his best friends' children and the early years of their lives.  *See* Letter from Eliecer Alvarado Letter, Ex. E at 1; Letter from Roberto Pascual, Ex. F at 1.  What is more, Rica has very likely cost himself the ability to raise biological children—a lifelong dream.  Before his fateful mistake of leaving the United States during the early days of the COVID pandemic—and the criminal

charges and guilty plea that followed—Rica and his then-husband, Edward, began the process of finding potential surrogates for IVF childbirth. It is extremely difficult, if not impossible, for gay men to become parents in this manner in other countries. This is just one extraordinary privilege of American residency—one that ought to be a universal civil right—that Rica has lost for the foreseeable future if not forever.

Rica's nearly 23 months of imprisonment also sends a strong message of general deterrence to anyone considering whether they could get away with implicating the United States financial system in a foreign bribery scheme. His conduct and its consequences say: If you try, you'll be caught. When you're caught, you will pay. If you leave the country before your charges are resolved, you will pay even more dearly. And given the long reach of American law, you may well serve a lengthy period of difficult incarceration for offenses relating to U.S. transactions before you resolve related criminal liability in the country most affected by your offense. General deterrence under these circumstances has "likely been largely achieved by the public attention to the prosecution of [Rica] and others in this case and through the substantial fines imposed on" himself, Odebrecht, and Braskem, "as well as the prosecution of many former employees" of those two companies that masterminded the global bribery scheme in which Rica played a peripheral role. *Hoskins*, No. 12-CR-238, ECF No. 631 at 82 (D. Conn. Mar. 6, 2020) (imposing sentence of 15 months). A sentence to the nearly 23 months that Rica has already served would send a loud and clear message that involving oneself in this kind of conduct will lead to prison and life-changing collateral consequences in the United States without the benefit of final resolution in your home country.

And Rica's lack of lawful status in the United States underscores the costs without benefits of a sentence to additional incarceration. His status would make it impossible to serve any additional time at the kind of lower-security facility appropriate to his conduct and characteristics. And the Court can and should fairly consider the fact that Rica may well serve time after the running of his criminal sentence in an ICE detention facility notorious for poor conditions. *See, e.g.*, *United States v. Thavaraja*, 740 F.3d 253, 262-63 (2d Cir. 2014); *Hoskins*, No. 12-CR-238, ECF No. 631 at 81 (D. Conn. Mar. 6, 2020) (relying on *Thavaraja* to "acknowledge[] the additional hardships that are likely to accompany him in any period of imprisonment as a result of his status as a foreign citizen); *see also United States v. Connolly*, No. 16-CR-370, ECF No. 457 at 91-93 (S.D.N.Y. Nov. 19, 2019) (McMahon, C.J.) (imposing a non-custodial sentence because of defendant's foreign-citizen status).

### E.  A Sentence to the Nearly 23 Months of Time Served is Appropriate

A sentence to the nearly 23 months of time that Rica has served would fit the punishment to the crime. It would account for Rica's prior history and future potential. It would be as appropriately proportionate to Mr. Grubisich's sentence as is currently possible, and situate Rica's sanction within the high end of the mainstream for participation in foreign bribery schemes. It would not to be the final word on Rica's conduct or the broader scheme in which it arose: he continues to face pending charges for the same conduct and money transfers in Panama. After serving nearly 23 months in Guatemala and at the MDC, Rica would emerge with a shattered reputation that he would have every incentive to begin to rehabilitate. Finishing his commitment to repatriate otherwise unrecoverable Odebrecht bribe monies, in order to satisfy United States forfeiture penalties and provide restitution to the scheme's only victims in Panama, would be just one step down Rica's long path toward some ultimate measure of repentance. Answering his Panamanian charges is one additional step. Making

KAPLAN HECKER & FINK LLP

14

amends with the partner, friends, and family whose lives he also upended along with his own is one other step, too.

    We respectfully request that the Court sentence Rica Martinelli to the considerable time he has already served.

Respectfully submitted,

Sean Hecker
Justin Horton
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118

*Counsel for Ricardo Martinelli Linares*