

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

May 6, 2022

By Hand and ECF

The Honorable Raymond J. Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Ricardo Alberto Martinelli Linares
      Criminal Docket No. 21-65 (RJD)

Dear Judge Dearie:

  The government respectfully submits this letter in advance of the sentencing hearing scheduled for May 20, 2022, for the defendant Ricardo Alberto Martinelli Linares ("Ricardo Alberto Linares"), and in opposition to the sentencing memorandum filed by the defendant seeking a sentence of time served.  (See ECF No. 53, Defendant's Sentencing Memorandum ("Def. Mem.") 1).  For the reasons set forth below, the government recommends that the Court impose a sentence of imprisonment within the Guidelines range set forth in the defendant's plea agreement, which is 108 to 135 months' imprisonment.

  On December 14, 2021, the defendant pled guilty to conspiracy to commit money laundering in violation of Title 18, United States Code, Section 1956(h).  This guilty plea stemmed from the defendant's role in a scheme to launder tens of millions of dollars in bribe payments on behalf of a close relative who was a high-ranking government official in Panama ("Panama Government Official"), to further conceal those bribe payments, and to ultimately spend the proceeds of that criminal conduct in the United States.

  In his sentencing memorandum, the defendant does not describe nor meaningfully address the full scope of his criminal conduct.  Instead, he argues for a sentence of time served based, in part, on his claim that he was merely a "middlem[a]n at the end of a single spoke on the hub of the Odebrecht bribery machine," and because of his "attempt to cooperate with U.S. authorities."  (Def. Mem. 10, 11).  While the defendant is correct that the overarching Odebrecht bribery scheme involved hundreds of participants in a dozen countries, the defendant's actions must be measured in the context of the crime with which he is charged.  The defendant was essential to the commission of that crime, and his criminal conduct was systematic and strategic—over a six-year period, the defendant and his brother and co-defendant Luis Enrique

Martinelli Linares ("Luis Martinelli Linares") opened and managed a network of secret shell companies and bank accounts that they used to launder almost $28 million in bribes from Brazilian holding company Odebrecht S.A. ("Odebrecht") on behalf of Panama Government Official and themselves; offered and provided their corrupt lobbying services to intervene on Odebrecht's behalf to bypass the protections of public ministries; invested the stolen bribe money on behalf of their family; and used millions of dollars of that money to purchase luxury goods for their own personal benefit. Moreover, the defendant's alleged cooperation was a façade—the defendant repeatedly hid crucial information from the government during the period when he was purportedly cooperating, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ and, when that attempt failed, ultimately crafted and executed an elaborate plan to flee the United States in order to escape responsibility for his crimes. The defendant is privileged, politically-connected and calculating, and both his criminal misconduct and his attempts to evade the consequences of that misconduct underscore the strong need for specific deterrence.

I. Background

    A. The Defendant's Offense Conduct

    The government's investigation in this case stems from a larger investigation into a massive bribery and money laundering scheme related to Odebrecht and its subsidiary Braskem, S.A. ("Braskem"), a Brazilian petrochemical company. Between approximately 2001 and 2016, Odebrecht paid approximately $788 million in bribes to government officials, their representatives and political parties in a number of countries in order to win business in those countries. The criminal conduct was directed by the highest levels of the company, with the bribes paid through a complex network of shell companies, off-book transactions and off-shore bank accounts. As part of the scheme, Odebrecht and its co-conspirators created and funded an elaborate, secret financial structure within the company that operated to account for and disburse bribe payments to foreign government officials and political parties. This structure ultimately became known as the "Division of Structured Operations" and effectively functioned as a stand-alone bribe department within Odebrecht.

    With respect to the above-captioned case, the government's investigation determined that between approximately August 2009 and September 2015, the defendant and Luis Martinelli Linares, together with others, conspired to facilitate the payment of bribes from Odebrecht to Panama Government Official and to conceal and spend the proceeds of that criminal conduct in the United States. During this time, and as a result of the bribes, Odebrecht won and maintained billions of dollars in over-priced contracts from the government of Panama for several of the country's highest profile public works projects ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬.[1]

---

[1] The government has filed very limited portions of this memorandum under seal, consistent with its prior filings in this case, and for the same reasons as set forth in those prior filings. (See, e.g., Gov't Letter dated November 15, 2021, ECF No. 23).

2

Beginning in approximately 2009, the defendant, along with Luis Martinelli Linares, opened and managed secret bank accounts held in the names of shell companies in foreign jurisdictions for the sole purpose of receiving, transferring, concealing and spending bribe payments that Odebrecht made for the benefit of Panama Government Official. The defendant and Luis Martinelli Linares opened and served as the signatories on the shell company bank accounts in Switzerland that initially received the bribes, and they authorized wire transfers through a structure of shell company bank accounts to conceal and spend the bribery proceeds. In total, the shell company bank accounts opened and controlled by the defendant and Luis Martinelli Linares received approximately $28 million in bribe proceeds from Odebrecht for the benefit of Panama Government Official, $19 million of which were transferred through correspondent bank accounts in the United States. The defendant and Luis Martinelli Linares also conducted financial transactions to and through the United States to conceal the bribery proceeds. Many of these financial transactions were in U.S. dollars and were made through U.S. banks, some of which were located in New York.

When foreign bankers began asking questions about the nature and source of the funds flowing into the shell company bank accounts, the defendant and Luis Martinelli Linares interacted with Odebrecht's top executive in Panama ("Odebrecht Panama Executive") in efforts to produce fake contracts to the foreign bankers to assuage their concerns. And when the foreign banks ultimately closed the defendant and Luis Martinelli Linares's U.S. dollar accounts, they worked with Odebrecht to avoid the U.S. financial system by routing bribe payments to Euro-denominated accounts at a different bank through new intermediaries for Panama Government Official, resulting in additional bribes totaling approximately $30 million not included in the indictment.

Immediately after the election of Panama Government Official, the defendant and Luis Martinelli Linares requested and received a meeting with Odebrecht Panama Executive in which they offered their lobbying services and asked how they could help Odebrecht. After additional meetings, Odebrecht Panama Executive agreed to pay the defendants $6 million in exchange for specific official actions on three major public works tenders. The defendants opened Swiss bank accounts in the names of shell companies and provided the account information to Odebrecht Panama Executive to begin receiving the bribes. After producing results on the first three projects, the defendants continued to contact Odebrecht Panama Executive to offer additional lobbying services, including offering to use their credentials as close family members of Panama Government Official to deliver favorable official actions from ministries and other public agencies. They also introduced Odebrecht Panama Executive directly to key ministers appointed by Panama Government Official. The defendants negotiated with Odebrecht Panama Executive the amounts of the additional bribes payments they received, and they told Odebrecht Panama Executive that they would use some of the funds to invest in their own private projects.

The defendant and Luis Martinelli Linares not only facilitated the payment of bribes from Odebrecht to Panama Government Official, but they personally benefited from the scheme. The defendant and Luis Martinelli Linares used the bribe money to make various investments in their names that benefited their family as a whole, including investing approximately $9.5 million in a cell phone service company and investing millions more in portfolios of stocks and bonds. Luis Martinelli Linares also purchased a $1.7 million yacht and a

$1.3 million Miami condo using bribe money, while the defendant spent hundreds of thousands of dollars in bribe money to pay off personal expenses billed to his American Express account.

In the course of its investigation, the government gathered the following evidence against the defendant and Luis Martinelli Linares: (1) foreign bank records for accounts that were used by the defendant and Luis Martinelli Linares to receive, conceal, and transfer the bribe payments from Odebrecht for the benefit of Panama Government Official; (2) U.S. bank records showing the use of U.S. correspondent banks for the bribe payments and the further transferring of those funds to conceal their illegal nature and source; (3) U.S. bank records and corporate receipts showing bribe proceeds spent in the United States; (4) email records and other corporate records from Odebrecht corroborating the scheme; (5) witness statements of former Odebrecht employees and agents involved in the scheme; (6) voluminous records from the secret electronic database that the Division of Structured Operations used to communicate and maintain records regarding the slush funds and bribes paid on behalf Odebrecht, including email communications, payment information, wire transfer requests, bank records and other records detailing the scheme and specifically the bribes that were paid to benefit Panama Government Official to bank accounts associated with the defendant and Luis Martinelli Linares.

### B. The Defendant's Failed Cooperation

In approximately 2018, following Odebrecht's guilty plea, the defendant and Luis Martinelli Linares met with the government on numerous occasions in connection with its ongoing investigations related to Odebrecht. The defendant and Luis Martinelli Linares also engaged in plea discussions with the government through counsel. By in or about June 2020, those plea discussions had advanced to the stage where the government and counsel for the defendant and Luis Martinelli Linares were exchanging drafts of plea documents and discussing the logistics of pleas to charges related to the criminal conduct detailed above.

During the period when the defendant and Luis Martinelli Linares were meeting with the government, neither the defendant nor Luis Martinelli Linares immediately took responsibility for their actions; it took several meetings before either admitted to their substantial knowledge of and participation in the bribery scheme, versus providing information about the criminal conduct of others. Moreover, the defendant and Luis Martinelli Linares provided key information about their own conduct very late in the series of meetings. However, as the defendant and Luis Martinelli Linares ultimately admitted to engaging in criminal conduct and provided information to the government that was useful in advancing its investigation, the government was—based on the information available to it at the time—prepared in 2020 to offer the defendant and Luis Martinelli Linares cooperation agreements.

Following the defendant and Luis Martinelli Linares' flight from the United States in June 2020, as detailed below, the government learned that neither the defendant nor Luis Martinelli Linares had engaged in the process of cooperation in good faith. Instead, counsel for the defendant and Luis Martinelli Linares advised the government in May 2021 that, while the defendant and Luis Martinelli Linares were purportedly cooperating with the government's investigation and negotiating a criminal resolution, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Subsequently, at the same time that the government was engaging in plea discussions with counsel, the defendant and Luis Martinelli Linares carefully planned to, and then, did, flee the country.

The government has also learned that the defendant and Luis Martinelli Linares were not forthcoming during the period of their alleged cooperation. For example, the defendant and Luis Martinelli Linares repeatedly advised the government that they were afraid to return to Panama due to (1) fear of retaliation from political enemies of Panama Government Official and (2) the fact that they faced criminal charges in Panama in two cases. The first case related to the Odebrecht criminal scheme (the "Odebrecht Panama Case"), and the second case related to a separate scheme in which the defendant and Luis Martinelli Linares were accused of receiving bribes for Panama Government Official from a company called Blue Apple that facilitated the payment of bribes from state contractors in Panama to government officials (the "Blue Apple Case"). However, unbeknownst to the government—and in preparation for their attempt to flee to Panama in June 2020—both the defendant and Luis Martinelli Linares applied for bail in Panama on their pending charges so that they would not be imprisoned when they returned. Specifically, on or about November 25, 2019, an attorney for the defendant and Luis Martinelli Linares requested that bail be set for them in both the Odebrect Panama and Blue Apple Cases. Bail was then set at $2 million for the brothers in the Odebrecht Panama Case on or about March 6, 2020, and at $5 million for the brothers in the Blue Apple Case on or about May 20, 2020. On or about June 22, 2020, Luis Martinelli Linares posted a total of $7 million in bail—$2 million in the Odebrecht Panama Case and $5 million in the Blue Apple Case—and days later, the defendant and Luis Martinelli Linares fled the United States. The defendant and Luis Martinelli Linares also failed to advise the government that they had sought and obtained invalid diplomatic credentials from the Central American Parliament, also known as PARLACEN, to use during their flight.[2]

---

[2] PARLACEN is a governmental body made up of representatives from Guatemala, El Salvador, Honduras, Nicaragua, the Dominican Republic and Panama. The defendant and Luis Martinelli Linares obtained signed documents stating that they were members of PARLACEN. However, PARLACEN officials have publicly confirmed that the defendant and Luis Martinelli Linares were never sworn in as members of PARLACEN and would not be sworn in as members in the future. See, e.g., Aminta Bustamante and Manuel Vega Loo, *El vicepresidente del Parlacen señala que los hermanos Martinelli Linares no han sido juramentados*, La Prensa (July 7, 2020, 2:47 PM), https://www.prensa.com/politica/el-vicepresidente-del-parlacen-senala-que-los-hermanos-martinelli-linares-no-han-sido-juramentados/ (PARLACEN confirms that the defendant and Luis Martinelli Linares were not sworn in as deputies) and EFE Servicios, *La presidenta del Parlacen afirma que no se juramentará a los hijos de Martinelli*, La Estrella de Panamá (July 31, 2020, 7:15 AM),  https://www.laestrella.com.pa/nacional/200731/presidenta-parlacen-afirma-juramentara-hijos-martinelli (PARLACEN confirms that the defendant and Luis Martinelli Linares will not be sworn in as deputies).

C. The Defendant's Flight from Prosecution

On or about June 25, 2020, the government learned that the defendant and Luis Martinelli Linares had—without any notice to the government—traveled by an unknown vessel to the Bahamas, evading United States border controls, and then boarded a private jet to fly to Panama. The defendant and Luis Martinelli Linares were accompanied on this trip by Luis Martinelli Linares' wife and children, confirming that the travel had been carefully planned in advance. However, the private jet was turned away from Panama due to COVID-19 travel restrictions; it first landed in Costa Rica on an emergency approval, and then made an authorized landing in El Salvador. In the meantime, the government filed a criminal complaint charging the defendants for the above-described criminal conduct, and arrest warrants for the defendant and Luis Martinelli Linares were issued from this District.

The defendant and Luis Martinelli Linares then traveled by Uber from San Salvador, El Salvador to the border with Guatemala, which was not permitting visitors into the country at that time due to COVID-19 travel restrictions. The defendant and Luis Martinelli Linares overcame the ban by presenting invalid diplomatic credentials at the border, falsely representing themselves as officials of PARLACEN to gain entry to Guatemala. While in Guatemala, the defendant and Luis Martinelli Linares, who have notable and significant political connections in Panama, were able to obtain emergency humanitarian authorization from Panama's Minister of Health permitting them to enter the country, in spite of Panama's complete lockdown due to the COVID-19 pandemic. In the meantime, the U.S. government sought the apprehension of the defendant and Luis Martinelli Linares in Guatemala through formal treaty processes, and on or about July 6, 2020, both were arrested at el Aeropuerto Internacional la Aurora in Guatemala City, Guatemala as they were attempting to board their family's private jet which was set to take them to Panama, having obtained the emergency humanitarian authorization.

While incarcerated in Guatemala, the defendant and Luis Martinelli Linares were initially held in an apartment rather than in a traditional prison facility. A professional interior designer, who had previously decorated the Miami condo described in the forfeiture allegations of the indictment and a house owned by Panama Government Official, flew from Miami to Guatemala and decorated the apartment with purchases from Ikea. The defendant and Luis Martinelli Linares remained in this apartment until July 2021, when they were moved by Guatemalan officials to a more secure detention area due to information that they were planning an escape.

Following the defendants' arrest in Guatemala, the government submitted a full extradition request to Guatemalan authorities. Over the next year and a half, Luis Martinelli Linares fought his extradition to the United States through extended litigation, multiple recusal motions and appeals. Notably, some of his litigation falsely contended that he was a PARLACEN member and was entitled to diplomatic immunity. On May 17, 2021, after several preliminary appeals were dismissed, the Guatemalan Fifth Criminal Sentencing Court granted the request by the United States to extradite him. On June 21, 2021, the Guatemalan Court of Appeals, Criminal Branch affirmed the ruling of the Guatemalan criminal court granting extradition. On October 15, 2021, the Guatemalan Ministry of Foreign Affairs notified the

United States, via diplomatic note, that the extradition was final and that Luis Martinelli Linares was ready for surrender to the United States. On November 15, 2021, Luis Martinelli Linares was removed to the United States.

The defendant similarly fought his extradition to the United States, filing multiple recusal motions and other preliminary challenges. It was only after the Guatemalan Court of Appeals, Criminal Branch affirmed that Luis Martinelli Linares would be extradited that the defendant also consented to extradition. On November 22, 2021, the Guatemalan Ministry of Foreign Affairs notified the United States, via diplomatic note, that the extradition was final and the defendant was ready for surrender to the United States. On December 10, 2021, the defendant was extradited to the United States.

### D. Guilty Pleas of the Defendant, Odebrecht and Braskem

On December 21, 2016, Odebrecht and Braskem pled guilty before the Court to separate criminal informations charging each with conspiracy to violate the anti-bribery provisions of the FCPA for their involvement in the above-described bribery and money laundering scheme. See United States v. Odebrecht, 16-CR-643; United States v. Braskem, 16-CR-643.

On February 4, 2021, a grand jury sitting in the Eastern District of New York returned a five-count indictment (the "Indictment") charging the defendant and Luis Martinelli Linares with money laundering offenses for the above-described criminal conduct. Both were charged with one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h), and two substantive counts of concealment money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); Luis Martinelli Linares was also charged with two counts of engaging in transactions in criminally derived property, in violation of 18 U.S.C. § 1957. Following their extraditions to the United States, both the defendant and Luis Martinelli Linares pled guilty to Count One of the Indictment in December 2021.

## II. Sentencing Guidelines and Probation's Sentence Recommendation

The government recommends that the Court adopt the below United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") calculation:

Money Laundering Conspiracy

| | |
|---|---:|
| Base Offense Level (§ 2S1.1(a)(2)) | 8 |
| Plus: Loss More than $25,000,000 (§ 2B1.1(b)(1)(L)) | +22 |
| Plus: Conviction under 18 U.S.C. § 1956(h) (§ 2S1.1(b)(2)(B)) | +2 |
| Plus: Offense Involved Sophisticated Laundering (§ 2S1.1(b)(3)) | +2 |
| Acceptance of Responsibility (§§ 3E1.1(a), 3E1.1(b)): | - 3 |

7

        Final Adjusted Offense Level:        31

As the defendant has no criminal history, he falls within Criminal History Category I, with an applicable range of imprisonment of 108 to 135 months.

      As detailed in the government's letter to Probation, dated March 10, 2022, setting forth its objections to the Presentence Report ("PSR"), the above-described Guidelines calculation – which was set forth in the defendant's plea agreement and stipulated to by the defendant, who joined in the government's objections – differs from the Guidelines calculation in the PSR and addendum to the PSR, dated April 18, 2022 ("PSR Addendum"), in two respects: (1) the PSR states that the base offense level should be 12, pursuant to § 2S1.1(a)(1) (PSR ¶ 22), but it is the government's position that the base offense level should be 8, pursuant to § 2S1.1(a)(2), because the underlying offense is a violation of foreign law (specifically, Panamanian law), and no offense level for that offense can be determined; and (2) the PSR states that an enhancement for multiple bribes should be applied (PSR ¶ 23), but it is the government's position that the enhancement does not apply for the same reason. The government maintains that its Guidelines calculation is accurate for the reasons set forth in its letter.

      The Probation Department has recommended a "significant custodial" sentence of 180 months' imprisonment and a "sizable fine" of $250,000 for the defendant, and has noted that there are no "significant mitigating factors" to consider.

III.    <u>Applicable Law</u>

      A "district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." <u>Gall v. United States</u>, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." <u>Id.</u> at 50 (citation and footnote omitted).

      Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

    (1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2)    the need for the sentence imposed—

        (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B)    to afford adequate deterrence to criminal conduct; [and]

     (C)  to protect the public from further crimes of the defendant.

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). "[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the Court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

  At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. Thus, the Court should first calculate the applicable Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

IV.  The Appropriate Sentence

  Contrary to the defendant's assertions, given the seriousness and scope of his criminal conduct, his failure to engage in the process of cooperation with the government in good faith and his flight from the United States in an attempt to escape responsibility for his actions, a substantial sentence of incarceration is warranted to provide just punishment, to promote respect for the law, and to effect adequate deterrence.

  A.  The Recommended Sentence is Appropriate Given the Nature and Circumstances of the Offense and the Need for Just Punishment

  The nature and seriousness of the defendant's offense counsels for a significant sentence of imprisonment in this case. The defendant spends only a fraction of his sentencing memorandum addressing his criminal conduct and, in doing so, gives no recognition to the serious consequences of his criminal conduct beyond the impact on himself and his family. He also contends that his actions "sit on the outer periphery" of the overarching Odebrecht scheme; suggests that they were motivated by a desire to prove himself to his family and to earn their "additional affection and approval"; and argues that the Guidelines calculation overstates the seriousness of the crimes because those Guidelines are unfairly "inflated" by the loss amount in the case. (Def. Mem. 4, 9). These statements minimize the seriousness of the defendant's conduct. The defendant was essential to the success of the crime with which he has been charged, and the fact the defendant committed his crimes with the aid of, and to benefit, family members, or agreed to join the conspiracy because of his interpersonal relationships, may serve as an explanation for his criminal conduct but does not excuse it or make it any less serious.

  The defendant is 42 years old and a wealthy, well-educated, politically connected and sophisticated investor and businessman. He made a conscious, knowing decision to join, further and profit from the conspiracy. ███████████████████████████

9

With that knowledge, and their business acumen and connections, the defendant and Luis Martinelli Linares negotiated and coordinated bribe payments with and offered their services to Odebrecht Panama Executive, and opened multiple Swiss bank accounts in the names of shell companies to receive approximately $28 million in bribes during the conspiracy period. When Swiss banks asked too many uncomfortable questions about the source of funds and began closing down the U.S. dollar accounts, the defendant and Luis Martinelli Linares found substitute account holders and worked with Odebrecht to send future bribe payments to new Euro-denominated accounts at a more accommodating bank, where additional bribes totaling approximately $30 million were paid for the benefit of Panama Government Official. The defendant and Luis Martinelli Linares worked assiduously to maintain a good relationship with Odebrecht Panama Executive to keep the bribe money flowing by corruptly lobbying and exploiting their access to government ministers and functionaries in addition to Panama Government Official. And during and after the scheme, the defendant and Luis Martinelli Linares invested the bribes in various ways that benefited themselves and their families, and, as detailed above, spent the bribe money lavishly on themselves, including on real estate, yachts and to cover personal expenses.

Moreover, the defendant's argument that the applicable Guidelines range overstates the seriousness of the crime because "more than seventy percent of [the defendant's] final offense level is a function of the dollar amount of other people's bribes" (Def. Mem. 9 (emphasis added)) minimizes the defendant's role in the crime and ignores the way in which he personally benefited from the conspiracy. The Guidelines here do not "overstate" the seriousness of the offense, because the $28 million figure that was used to calculate the Guidelines is not an intended or estimated loss, but the actual bribe amount that the defendant, Luis Martinelli Linares and Panama Government Official—not "other people"—pocketed and benefited from, in the form of investments and spending, as a result of their crimes. Moreover, the $28 million figure also understates the scale of the defendant's corrupt acts, which included passing the baton for receiving Odebrecht bribe payments to new intermediaries who took in an additional $30 million in Euro transfers, and which resulted in over-priced Odebrecht contracts charged to public funds.

B.  The Recommended Sentence is Appropriate to Promote Respect for the Law

The corrosive effects of corruption of government officials are clear: among other harms, bribery schemes undercut fair business practices and the rule of law, siphon money away from much-needed public programs, destabilize countries and even entire regions, and facilitate human rights abuses. Only the corrupt prosper; societies, governments and legitimate businesses lose. The United States has long recognized the harmful effects caused by bribery of foreign officials, as well as the laundering of proceeds of such schemes through the United States financial system, and sought to combat them.

The defendant was directly involved in facilitating bribes for Panama Government Official in connection with Odebrecht's involvement in public works projects, including the Panama Metro. To date, Panama has been unable to put an exact dollar amount on the country's

losses, but Panamanian authorities have advised the U.S. government that they estimate that Odebrecht construction projects ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅ generated hundreds of millions of dollars in overpayments to Odebrecht from the public funds of Panama.³ It is clear that the defendant, Luis Martinelli Linares, their families, their co-conspirators and Panama Government Official all profited from the illegal scheme at the expense of the Panamanian people.

Here, the recommended sentence would make clear that people like the defendant who aid elected officials like Panama Government Official, who cheat and steal from their own people to enrich themselves, and profit from the same, will be held accountable for their illegal conduct.

C. The Recommended Sentence is Appropriate to Afford Adequate Specific and General Deterrence to Similar Criminal Conduct

The need for specific deterrence in this case is great, as the defendant has repeatedly demonstrated that he believes himself to be above the law, and has consistently relied on his substantial privilege in an attempt to avoid the consequences of his actions. The brazen and prolonged nature of the defendant's initial criminal conduct demonstrated that he understood that he could operate with impunity given the power of Panama Government Official and the protection that power provided. And the defendant's behavior since the end of the conspiracy period demonstrates that he still believes this to be true, and that he has continued—and will continue—to exploit that power, and those privileges, whenever expedient and to whatever end he desires, regardless of the legality of his actions.

The circumstances of the defendant's failed cooperation and his flight from the United States are significant for this reason. As detailed above, between 2018 and 2020, the defendant and Luis Martinelli Linares spoke with the government on several occasions and did provide information that was helpful to the government's investigation. But it is clear in hindsight that the defendant and Luis Martinelli Linares never intended to take responsibility for their criminal conduct by pleading guilty. To the contrary, during the period that the defendant and Luis Martinelli Linares were allegedly cooperating, the defendant and Luis Martinelli Linares were withholding information about their own culpability and prolonging the process of getting to a guilty plea in the hopes that they could once again lean on their connections and their wealth—this time not to profit illegally, but to get out of taking responsibility for those actions. ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅. When that didn't work, and it was clear that they would have to plead guilty, they went to great lengths to set up an elaborate escape route back to Panama (while at the same time falsely telling the

---

³ Panamanian authorities have made a request for restitution in this case. Following discussions with the U.S. government, Panamanian authorities are considering whether to withdraw this request in order to further develop evidence of loss as part of a post-sentencing request to the Department of Justice to share in the forfeited assets. Even if this request is not withdrawn before May 20, 2022, the sentencing may proceed because the Court may consider issues of restitution after sentencing.

government that they were afraid to return there), because they apparently expected to have an easier time avoiding prosecution there.

The defendant and Luis Martinelli Linares arranged for bail to be set for pending charges in the Odebrecht Panama Case and the Blue Apple Case; paid bail for Luis Martinelli Linares in those cases; and obtained invalid PARLACEN credentials to use during their escape. Then, in June 2020—at the height of the COVID-19 crisis, and with most international borders closed—they arranged to avoid border checks and leave the United States with Luis Martinelli Linares's wife and children via a private boat from Florida to the Bahamas, where they picked up a private plane to fly to Panama.[4] When that plane was turned away from Panama due to travel restrictions, the defendant and Luis Martinelli Linares used their political connections to secure permission to land the jet in El Salvador. Once there, they were informed that law enforcement was looking for them, and so they left Luis Martinelli Linares' family behind in El Salvador and took an Uber to Guatemala, using their invalid PARLACEN credentials to get across the border. The defendant and Luis Martinelli Linares then used their political connections once again to get the Panama Minster of Health to approve a waiver to the country's COVID-19 restrictions to allow them to enter the country, and they traveled to the airport in Guatemala to try and board yet another private jet to Panama. After they were apprehended at the Guatemala airport, they enjoyed privileged accommodations in Guatemala for a year, which were decorated by an interior designer who flew in from Miami, and were only moved to normal prison conditions after the Guatemalan authorities got information that the defendant and Luis Martinelli Linares were planning to escape. During this time period, the defendant and Luis Martinelli Linares fought extradition through multiple rounds of appeals.

Only after <u>all</u> of these efforts to leverage their wealth and political connections failed did the defendant and Luis Martinelli Linares agreed to waive any remaining appeals and be extradited to the United States. Based on this history, it is clear that, should the defendant have the opportunity right now to use those same privileges to avoid taking responsibility, he would. For this reason, a significance sentence is necessary for specific deterrence.

In addition, the government also asks this Court to consider the need for general deterrence of those who would consider engaging in similar conduct under similar scenarios. Given the strong economic incentives in taking advantage of countries with public officials willing to trade contracts for kickbacks, it is critical that there be equally strong counterincentives. See United States v. Blech, 550 F. App'x 70, 71 (2d Cir. 2014) (summary order) ("Blech was sentenced based on the 18 U.S.C. § 3553(a) factors, including the need for specific deterrence for a recidivist, and the need for general deterrence for those who might

---

[4] The defendant contends that he left the United States in June 2020 because he feared that he would not receive a deferred action letter from the government and worried about the "threat of sudden deportation." (Def. Mem. 5). As the government explained in its filing seeking detention of the defendant, however, this stated reason for his flight is different than one previously provided to the government. (See ECF No. 35, at 7 n.4). Moreover, at the time that the defendant fled, the government's request for deferred action was in process, and the defendant's own immigration attorney expressed no sense of urgency about the timing of the approval of that request. (Id.).

12

otherwise feel that some white-collar crimes are 'game[s] worth playing.'") (quoting United States v. Goffer, 721 F.3d 113, 132 (2d Cir. 2013)); S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259 ("The second purpose of sentencing is to deter others from committing the offense. This is particularly important in the area of white collar crime. Major white collar criminals often are sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business.")). The government's recommended sentence will send a strong deterrent message to other public officials and their close family members who, like the defendant, seek to sell out their country and its public resources to the highest bidder in exchange for personal wealth and luxury.

Furthermore, given that sophisticated fraud schemes, like the instant scheme with multiple international actors, are difficult to detect and prosecute, there is greater need for general deterrence. See, e.g., Harmelin v. Michigan, 501 U.S. 957, 988 (1991) (noting that "since deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties"). Because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." See, e.g., United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005)) (internal quotation marks omitted)); United States v. Heffernan, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Drago Francesco, Roberto Galbiati & Pietro Vertova, The Deterrent Effects of Prison: Evidence From a Natural Experiment, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence.").

D. The Defendant's Personal History and Characteristics Do Not Outweigh the Serious Nature of His Crime

The defendant's sentencing memorandum details his personal history, including his professional successes, acts of kindness and charitable contributions to others, and personal and family circumstances. (See, e.g., Def. Mem. 2-3, 12-13). The government agrees that these factors should be considered by the Court in arriving at a sentence under 18 U.S.C. § 3553(a), and the government's proposed sentence accounts for the defendant's circumstances. But while the defendant has had significant opportunities to help others, his actions in this regard do not set him apart from similarly situated defendants who have had the opportunity to engage in good deeds and charitable acts, face the same or similar challenges as a result of incarceration, and whose families often suffer disproportionately despite having no role in the criminal conduct.

Indeed, "[c]ivic, charitable or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a departure is warranted." U.S.S.G. § 5H1.11. Instead, charitable work warrants a downward departure only

13

where it is "present to an exceptional degree or in some other way makes the case different from the ordinary case where [charitable work] is present." United States v. Canova, 412 F.3d 331, 358 (2d Cir. 2005). Moreover, "more is expected" of those defendants "who enjoy sufficient income and community status so that they have the opportunities to engage in charitable and benevolent activities." United States v. Cooper, 394 F.3d 172 (3d Cir. 2005) (internal quotation marks omitted). Cf., e.g., United States v. Crouse, 145 F.3d 786, 792 (6th Cir. 1998) (no downward departure warranted where a defendant's "community works," while "significant," are "not unusual for a prominent businessman"). These principles should similarly guide an analysis under Section 3553(a). And here, while the defendant may have, prior to the charged criminal conduct, his attempts to obstruct the government's investigation and his flight from the United States, led an otherwise law-abiding life and engaged in charitable work, his personal and family characteristics do not absolve him of responsibility for his serious and long-lasting criminal conduct, and are not so extraordinary or exceptional as to warrant the leniency he seeks, that is, time served.

### E. The Defendant Is Not Similarly Situated to Jose Carlos Grubisich

The defendant argues at length that a sentence other than one of time served would be unfair because this Court recently sentenced Jose Carlos Grubisich, the former Chief Executive Officer ("CEO") of Braskem, to 20 months' incarceration, and it is the defendant's contention that Grubisich was one of the "ultimate leaders" of the scheme. (Def. Mem. 9-11). Essentially, the defendant argues that because Grubisich was a "senior leader" of the scheme and the defendant was a "peripheral actor who passed on money to enrich someone else," the defendant should receive a similar or even lesser sentence than Grubisich. (Id.).

As an initial matter, and as the Court is aware, the government advocated for a sentence of 60 months' imprisonment for Grubisich, who pled guilty to two conspiracies pursuant to 18 U.S.C. § 371 (conspiracy to violate the anti-bribery provisions of the Foreign Corrupt Practices Act ("FCPA") and conspiracy to violate the books and records provisions of the FCPA and to fail to accurate certify financial reports) that each had a maximum sentence of five years and were set to run concurrently.

Moreover, the defendant's argument is unpersuasive because while the defendant and Grubisich did participate in the same overarching bribery and money laundering scheme—which had hundreds of participants in more than a dozen countries—they are differently situated, and the defendant's own actions, both during and after the crime, make clear that a more significant sentence is warranted here. First and most significantly, following his arrest, Grubisich pled guilty and accepted responsibility for his crimes. By contrast, the defendant never truly accepted responsibility for his actions—knowing that the investigation was focused on his conduct, he carried on the façade of cooperating with the government's investigation for almost two years, all while withholding significant information about his own culpability and attempting to obstruct the government's investigation. Then, when it became clear that his attempts to evade responsibility would not be successful, he planned and executed an elaborate escape from the United States with Luis Martinelli Linares and his entire family to avoid prosecution.

Second, while Grubisich earned a salary and bonuses for his work at Braskem, which included directing others to use Braskem's funds for bribe payments, he did not personally receive or spend any bribe money. By contrast, the defendant—who did not direct or supervise others, but engaged in the criminal conduct directly—not only facilitated tens of millions of dollars in bribe payments for Panama Government Official, but personally benefited from the scheme, using those funds to make investments and spend lavishly on real estate, yachts and other personal expenses. Whereas Grubisich took corrupt actions as a corporate officer maximizing profits, the defendant took corrupt actions as a citizen arrogating public functions to himself for his personal status and luxury while selling out his country and undermining the integrity and resources of his government. The defendant's contention that he merely "passed on money to enrich someone else" (Def. Mem. 11) is belied by his own use of bribe proceeds to pay his expenses, and the manner in which those proceeds was used to benefit himself and his family members.

Finally, Grubisich's personal circumstances differed from those of the defendant. At the time of sentencing, Grubisich was 64 years old and had chronic coronary disease, while the defendant is far younger and in good health. Moreover, while the defendant and Grubisich both discussed how they used their wealth to further charitable works—which, as noted above, the government contends should be given limited weight by the Court—it is clear that, on balance, Grubisich's public service undertakings were far more significant and had a larger impact on the public life of his home country, including his work to help establish the equivalent of the Food and Drug Administration in Brazil, and his leadership of several non-profit organizations devoted to the defense of the rights of children, adolescents and the environment.

F.  The Defendant's BOP Classification Is Not An Appropriate Sentencing Factor

The defendant urges the Court to depart downward based on his assertion that he would not be eligible to be designated to a "lower-security facility" like a federal prison camp due to his status as a non-citizen.[5] As an initial matter, many foreign national non-resident defendants are subject to the exact same post-sentencing conditions.

Moreover, the Second Circuit has repeatedly rejected the same argument in the context of a downward departure for reasons that apply with equal force to the defendant's request for a variance. In United States v. Restrepo, 999 F.2d 640, 641 (2d Cir. 1993), the Second Circuit held that, although there may be rare circumstances when alienage can be considered in sentencing a defendant, a district court may *not* consider "(1) the unavailability of

---

[5] In his sentencing memorandum, the defendant also detailed the conditions at the Metropolitan Detention Center ("MDC"), where he has been detained since December 2021. (Def. Mem. 6-7). The defendant had an initial quarantine period pursuant to the MDC's standard procedures to combat COVID-19, which are applied to all new inmates. The subsequent periods during which the defendant's movements were restricted were also as a result of procedures instituted for all inmates, either due to concerns about containing the spread of the Omicron variant of COVID-19, or as a result of a national lockdown instituted by the BOP at all BOP facilities. There have been no restrictions in place since February 17, 2022.

preferred conditions of confinement, (2) the possibility of an additional period of detention pending deportation following the completion of sentence, and (3) the effect of deportation as banishment from the United States and separation from family, justified the departure." Id. at 644.

With respect to the issue of whether the defendant could be designated to a camp, the Second Circuit stated that BOP did not have a steadfast policy against doing so, but noted:

> Even if it were a steadfast policy of the Bureau to deny reassignment to relaxed-security facilities to alien prisoners who must be deported on account of their convictions, we would consider that policy an inappropriate basis for departure from the imprisonment range prescribed by the Guidelines. Assuming that § 3624(c) was intended to apply to deportable aliens, the statute does not on its face require the Bureau to ensure that all prisoners participate in such a program, but only to do so if practicable. For example, the Bureau need not reassign the prisoner to a halfway house if there is no such unit in his home state, and the absence of such a facility has been held to be an impermissible ground for departure from the Guidelines.

Id. at 645 (citation omitted). The Second Circuit concluded that, "if there is a defect in the Bureau's policy toward reassignment of deportable aliens, the appropriate way to remedy that defect would be pursuit of an action that challenges such a policy head-on, not the ad hoc granting of departures that have the effect of creating the very type of disparity in sentencing that the adoption of the Guidelines was intended to eliminate." Id. at 646. [6]

---

[6] Notably, the Court declined to consider as a factor at Grubisich's sentencing the fact that he was a foreign national non-resident.

V.	Conclusion

        For the foregoing reasons, the government respectfully requests that the Court impose a sentence within the applicable Guidelines range of 108 to 135 months' imprisonment. This sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing. See U.S.S.G. § 3553(a)(2).

        Respectfully Submitted,

        BREON PEACE
        United States Attorney

By:    /s/
        Alixandra Smith
        Assistant U.S. Attorney
        (718) 254-6370

        JOSEPH S. BEEMSTERBOER
        Acting Chief, Fraud Section
        Criminal Division
        Department of Justice

By:    /s/
        Michael Harper
        Trial Attorney

        DEBORAH L. CONNOR
        Chief, Money Laundering and Asset
        Recovery Section
        Criminal Division
        Department of Justice

By:    /s/
        Michael Redmann
        Trial Attorney

cc:    Clerk of Court (RJD) (by ECF)
       Defense counsel (by ECF)